VARANESE, APPELLEE, *v.* GALL ET AL.; LAKE-GEAUGA PRINTING COMPANY, D.B.A. GEAUGA TIMES LEADER, APPELLANT, ET AL.

[Cite as Varanese *v.* Gall (1988), 35 Ohio St. 3d 78.]

(No. 87-636—Decided February 3, 1988.)

*man, Forrest A. Norman* and *James M. Speros,* for appellant.

DOUGLAS, J. The instant appeal poses a single question: Did appellee present evidence sufficient to withstand appellant's motion for summary judgment on the issue of actual malice? For the following reasons, we hold that she did not.

The parties to this appeal do not dispute appellee's status as a public official. As such, appellee bears the burden of proving, with convincing clarity, that appellant published the advertisement at issue with actual malice. *New York Times Co.* v. *Sullivan* (1964), 376 U.S. 254; *Bukky* v. *Printing Co.* (1981), 68 Ohio St. 2d 45, 22 O.O. 3d 183, 428 N.E. 2d 405, syllabus. Our initial inquiry, therefore, must focus on what constitutes actual malice in defamation cases.

We note at the outset that the concept of actual malice in public-official defamation cases involving media defendants should not be confused with the traditional common-law standard of actual malice. In the common law, actual malice connotes ill will, hatred, a spirit of revenge, or a conscious disregard for the rights and safety of other persons which has a great probability of causing substantial harm. *Preston* v. *Murty* (1987), 32 Ohio St. 3d 334, 512 N.E. 2d 1174, syllabus. These elements are constitutionally insufficient to prove actual malice in the context of a public-official defamation case under *New York Times Co.* v. *Sullivan, supra. Cantrell* v. *Forest City Pub. Co.* (1974), 419 U.S. 245. Evidence of hatred, spite, vengefulness, or deliberate intention to harm

*Don C. Iler Co., L.P.A.,* and *Don C. Iler,* for appellee.

*Gallagher, Sharp, Fulton & Nor-*

---

[1] See Appendix I, *infra,* at 86-87. As it originally appeared in the Geauga Times Leader on November 1, 1982, the advertisement measured a full page. It was printed in black, red and blue ink, with the name "Tony Gall" at the bottom in blue block letters one inch high.

80

can never, standing alone, warrant a verdict for the plaintiff in such cases. *Dupler* v. *Mansfield Journal Co.* (1980), 64 Ohio St. 2d 116, 119, 18 O.O. 3d 354, 356, 413 N.E. 2d 1187, 1190. This is because the focus of inquiry is *not* on the defendant's attitude toward the plaintiff, but rather on the defendant's attitude *toward the truth or falsity* of the statement alleged to be defamatory. *Id.* at 119, 18 O.O. 3d at 356, 413 N.E. 2d at 1190-1191; *Grau* v. *Kleinschmidt* (1987), 31 Ohio St. 3d 84, 89, 31 OBR 250, 254, 509 N.E. 2d 399, 403. A defendant who was motivated to publish by the blackest spirit of hatred and spite will not be liable if he subjectively believed in the truth of the statement. See Smolla, Law of Defamation (1986) 3-38, Section 3.15.

Actual malice in defamation cases may be demonstrated only by evidence that the defendant published the statement at issue "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co.* v. *Sullivan, supra,* at 279-280. Such reckless disregard may be established by clear and convincing evidence that the defendant proceeded to publication despite a "high degree of awareness of * * * probable falsity," *Garrison* v. *Louisiana* (1964), 379 U.S. 64, 74, or that "the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant* v. *Thompson* (1968), 390 U.S. 727, 731. The United States Supreme Court has emphasized that "reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates ac-

tual malice." *St. Amant, supra,* at 731. The plaintiff must prove the defendant's actual knowledge or reckless disregard for the truth *with convincing clarity* in order to warrant submission of the cause to the jury. *Grau, supra,* at 89, 31 OBR at 254, 509 N.E. 2d at 403. Finally, actual malice is to be measured as of the time of publication. *Dupler, supra,* at 124, 18 O.O. 3d at 359, 413 N.E. 2d at 1193.

We hold, therefore, that the concept of actual malice in defamation cases involving public officials is separate and distinct from the traditionally defined common-law standard of malice or actual malice. Actual malice in the context of defamation may not be inferred from evidence of personal spite, ill will, or deliberate intention to injure, as the defendant's motives for publishing are irrelevant. A defamation plaintiff who is required to show actual malice must demonstrate, with convincing clarity, that the defendant published the defamatory statement either with actual knowledge that the statement was false, or with a high degree of awareness of its probable falsity.

In reviewing the instant cause, this court is mindful of its responsibility to conduct an independent examination of the record to ensure against forbidden intrusions into constitutionally protected expression. *Bose Corp.* v. *Consumers Union of U.S., Inc.* (1984), 466 U.S. 485, 508, rehearing denied (1984), 467 U.S. 1267. We are also aware of the fact that the judgment before us is the trial court's granting of appellant's motion for summary judgment. This court has observed that "[s]ummary procedures are especially appropriate in the First Amendment area" due to the potential chilling effect which the threat of a lawsuit may have on the exercise of First Amendment rights. *Dupler, supra,* at 120, 18

O.O. 3d at 357, 413 N.E. 2d at 1191. It is for this reason that the plaintiff's burden of establishing actual malice must be sustained with convincing clarity even when the plaintiff's case is being tested by a defendant's motion for summary judgment. *Dupler, supra,* at paragraphs one and two of the syllabus; *Bukky, supra,* at syllabus. The United States Supreme Court has recently held that "a court ruling on a motion for summary judgment must be guided by the New York Times 'clear and convincing' evidentiary standard in determining whether a genuine issue of actual malice exists — that is, whether the evidence presented is such that a reasonable jury might find that actual malice had been shown with convincing clarity." *Anderson* v. *Liberty Lobby, Inc.* (1986), 477 U.S. __, __, 91 L. Ed. 2d 202, 217. It should be remembered, however, that for purposes of ruling on a defendant's summary judgment motion in this context, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at __, 91 L. Ed. 2d at 216.

With all these principles in mind, we turn now to a consideration of whether appellee sustained her burden of demonstrating actual malice with convincing clarity. Our determination of this question mandates an independent review of the record and, particularly, the evidence adduced by appellee in opposition to appellant's motion for summary judgment.

In her brief in opposition to appellant's motion, appellee attached seven exhibits. The first exhibit is a copy of the allegedly defamatory ad. This item of evidence was no doubt offered to show the contents of the ad, and not to show actual malice, since no contention is made, and none could be made, that the allegations in the ad are "so inherently improbable that only a reckless man would have put them in circulation." *St. Amant, supra,* at 732.

The second exhibit consists of certain answers to interrogatories propounded to appellee by another defendant, Tony Gall, who is not involved in this appeal. Appellee's answers alleged that the ad in question was prepared by the opposition political party for its candidate, Gall, who, appellee alleges, approved the ad for publication without checking its accuracy in any way. Clearly, these allegations are not probative of appellant's state of mind.

The third exhibit presents excerpts from appellee's deposition. The thrust of her testimony is basically threefold. Appellee first alleges that the footnotes in the ad citing appellant as a source for the allegations gave appellant serious reason to doubt their veracity, since appellant's own articles were actually unsupportive of these charges. This contention is utterly without merit. The United States Supreme Court has held that the mere presence of conflicting stories in a defendant's own files does not establish that the defendant knew that the ad was false, "since the state of mind required for actual malice would have to be brought home to the persons in * * * [the defendant's] organization having responsibility for the publication of the advertisement." *New York Times Co.* v. *Sullivan, supra,* at 287. Appellee next alleges that appellant could easily have checked the accuracy of the ad by reference to documents either in its possession or readily accessible to appellant. This contention must also fail. "Failure to investigate does not in itself establish bad faith." *St. Amant, supra,* at 733, citing *New York Times Co.* v. *Sullivan, supra,* at 287-288. The third basis offered by appellee to support her claim of actual malice is her testimony concerning the presence of a reporter, employed by

appellant, at certain public meetings attended by appellee. Appellee alleges that this reporter would have known from appellee's remarks at these meetings that appellee never advocated the positions attributed to her in the ad, such as the elimination of veterans' services. This argument is baseless. The fact that appellee never advocated these positions in meetings at which appellant's reporter was present does not even remotely establish that appellant realized the falsity or probable falsity of the allegation that appellee had at one time or another advocated that position.

At best, these arguments establish only that appellant "should have known" of the alleged falsity of the ad. As noted above, however, mere negligence is constitutionally insufficient to show actual malice. *St. Amant, supra,* at 731; *Dupler, supra,* at 119, 18 O.O. 3d at 356, 413 N.E. 2d at 1191.

The fourth exhibit offered by appellee consists of portions of a deposition taken of Herbert Thompson, who was appellant's general manager at the time the ad in question was published. These excerpts contain statements by Thompson that he did not investigate the accuracy of the ad, did not research the footnotes, and did not discuss the ad with the person responsible for advertising. Again, these statements may or may not raise an issue of negligence, but certainly do not establish knowledge of falsity or suspicion of probable falsity.

The fifth exhibit, upon which appellee relies most heavily, contains excerpts from the deposition of Robert Curran, appellant's editor at the time the ad was published. Appellee particularly emphasizes Curran's testimony

---

[2] The relevant portion of Curran's deposition is found in Appendix II, *infra,* at 88-90.

that he saw the ad several days before it was published and remarked to Thompson, the general manager, that the ad was "bullshit." Appellee insists that his statement demonstrates knowledge of falsity or a high degree of awareness of probable falsity. Our review of the context of Curran's remark[2] compels us to disagree. Curran explained that his statement that the ad was "bullshit" was an expression of his concern that if the ad were false, appellant would be included in any subsequent lawsuit. He stated that his concern was appellant's potential exposure to suit in the event that the ad's charges proved to be untrue. Curran never stated that he knew the charges were false, or that he entertained any doubt whatsoever as to their probable falsity. He merely expressed concern that the charges *might* be false, and if they were, then appellant might be sued. The fact that Curran may have entertained doubts as to the *possible* falsity of the ad is immaterial. For liability to attach, a defendant must proceed to publication despite a "high degree of awareness of * * * [the] *probable* falsity*" of the published statements. (Emphasis added.) *Garrison* v. *Louisiana, supra,* at 74. Given Curran's explanation that his remark was not an expression of knowledge of falsity or serious doubts as to probable falsity, his statement cannot be considered probative of actual malice, and certainly cannot be deemed to have established actual malice "with convincing clarity."

The sixth exhibit contains appellee's answers to interrogatories propounded by appellant, in which appellee claims that appellant acted with actual malice in publishing the ad. In response to a request for the names of individuals who acted with actual malice, appellee lists only Herbert Thompson, appellant's general manager. In

support of this claim, appellee inaccurately alleges that Thompson proceeded to publication despite Curran's warning that the ad was "libelous." The record before us, however, demonstrates that Curran only told Thompson that the ad might subject the paper to a libel suit. Such a statement does *not* establish Thompson's own subjective belief in the falsity or probable falsity of the ad.[3] Whether or not Thompson's acts were reasonable is not a relevant consideration, as mere negligence is insufficient to establish liability.

The seventh and final exhibit was a copy of R.C. 3599.091, relating to political campaign guidelines. This exhibit can have no relevance to appellant's state of mind, nor was it intended to be evidence of such.

Our independent review of the evidence compels us to conclude that appellee has failed to adduce evidence sufficient to establish actual malice with convincing clarity. The thrust of appellee's argument is that appellant had ready access to information that should have triggered suspicion regarding the truthfulness of the ad or that should have prompted an investigation of its accuracy. These allegations, if true, might raise an issue of negligence, but they do not demonstrate actual malice.

We consider it appropriate at this juncture to address the more specific question of the liability of a media defendant for its failure to check the accuracy of a paid political advertisement before proceeding to publication thereof. Appellee has alleged that appellant had a duty to investigate the charges made in the ad, particularly given the fact that the ad referred to appellant as a source for several of those charges.

In resolving this issue against appellee, we emphasize that acceptance of appellee's argument would necessarily impose restrictions on constitutionally guaranteed freedoms of expression, a position which we must be extremely reluctant to take. The very notion of a court interfering with the free flow of debate on matters of profound public concern is repugnant to our democratic way of life. We should never forget that an unfettered press is the custodian of all our liberties and the guarantor of our progress as a free society. "The First Amendment presupposes that the freedom to speak one's mind is not only an aspect of individual liberty — and thus a good unto itself — but also is essential to the common quest for truth and the vitality of society as a whole." *Bose Corp., supra,* at 503-504. The United States Supreme Court has remained uncompromising in its position on defamation, due to a concern that " '[w]hatever is added to the field of libel is taken from the field of free debate.' " *New York Times Co.* v. *Sullivan, supra,* at 272, quoting *Sweeney* v. *Patterson* (C.A.D.C. 1942), 128 F. 2d 457, 458. Preservation of free expression is of particular urgency in the political arena, since it is almost universally agreed that a major purpose of the First Amendment is to ensure vigorous, uninhibited discussion of governmental affairs. *Buckley* v. *Valeo* (1976), 424 U.S. 1, 14. This is an important reason why the United States Supreme Court has bestowed such formidable protections on a

---

[3] See *Anderson* v. *Liberty Lobby, Inc.* (1986), 477 U.S. ___, 91 L. Ed. 2d 202, where the editor of the defendant magazine had told the defendant's president and chief executive officer before publication that the articles in question therein were "terrible" and "ridiculous." *Id.* at ___, 91 L. Ed. 2d at 210.

defendant in a defamation action brought by a public official, even for statements proven to be erroneous. See *New York Times Co.* v. *Sullivan, supra,* at 271-272. As one way of achieving this protection, the court has expressly rejected a negligence standard for media defendants. *St. Amant, supra,* at 731. Thus, a mere failure to investigate the accuracy of a news story cannot, by itself, establish liability. *Id.* at 733.

We are persuaded that these protections apply with special force to paid political advertisements. Such ads, unlike many news stories, are not generated from within the media organization itself — a fact which, practically speaking, should diminish media responsibility for the accuracy of any statements contained in such ads. It should be noted that the political advertisement in *New York Times Co.* v. *Sullivan, supra,* was checked by *no one* at the defendant newspaper, and still the court refused to impose liability. *Id.* at 287-288. The defendant's advertising manager therein relied on the reputation of the sponsors of the ad. *Id.* at 287. The court considered this factor to be probative of an absence of actual malice. *Id.* Even where such reliance is negligent, liability will not lie. *St. Amant, supra,* at 730-733. However, where the contents of the proposed publication "are so inherently improbable that only a reckless man would have put them in circulation," the defendant may be guilty of actual malice. *St. Amant, supra,* at 732.

Accordingly, we hold that in defamation cases, a newspaper's liability for failure to check the accuracy of advertisements, including political advertisements, is limited to those cases where the defendant actually knew the ad was false before publication, or where the ad is so inherently improbable on its face that the defendant must have realized the ad was probably false. Thus, it may be seen that the mere failure to verify the truth of a statement is insufficient to raise an issue with respect to actual malice unless the statement is facially incredible or the defendant had subjective reason to doubt the source's reliability. *Id.* Our review of the contents of the ad in this case reveals nothing "so inherently improbable that only a reckless man would have put * * * [it] in circulation." *Id.* The record contains no evidence that appellant had any subjective reason to doubt the reliability of the sources of the ad.[4]

In sum, we have found no evidence from which a reasonable jury could find actual malice with convincing clarity. Therefore, the judgment of the court of appeals is reversed insofar as it pertains to appellant, and the judgment of the trial court is reinstated.

*Judgment reversed.*

MOYER, C.J., SWEENEY, LOCHER, WRIGHT and H. BROWN, JJ., concur.

HOLMES, J., dissents.

---

[4] In support of its motion for summary judgment, appellant presented the affidavit of Susan O. Waddell, who was advertising representative for the Geauga Times Leader when the ad in question was submitted for publication. She stated that "those who presented the advertisement for publication had good reputations in the community, and I relied upon the reputations of those individuals and the representations they made that the ad was accurate when I made my decision to approve it for publication." She further stated that she "did not believe anything in the advertisement was false, and had no reason to disbelieve anything that was set forth in the advertisement."

HOLMES, J., dissenting. In properly applying all the law relative to when a trial court may overrule a motion for summary judgment filed in a libel action brought by a public official against a news media agency, I would affirm the court of appeals in this matter. In *Anderson* v. *Liberty Lobby, Inc.* (1986), 477 U.S. ___, ___, 91 L. Ed. 2d 202, 217, the Supreme Court of the United States held that while a libel plaintiff must prove some affirmative evidence of actual malice, the plaintiff, "to survive the defendant's motion, need only present evidence from which a jury might return a verdict in his favor. If he does so, there is a genuine issue of fact that requires a trial."

*Anderson* does not change Ohio Rule of Civil Procedure 56, which provides in effect that summary judgment may be granted only when the following three criteria are present:

(1) There exists no genuine issue as to any fact, and

(2) the moving party is entitled to judgment as a matter of law, and

(3) reasonable minds could come to but one conclusion, and that conclusion is adverse to the party against whom the motion is made, who is entitled to have the evidence construed most strongly in his favor.

The court of appeals premised its findings upon a review of the record submitted, which included depositions and affidavits in connection with the motion for summary judgment. Some of this is set forth in Robert Curran's deposition at Appendix II of this opinion. Upon such record, the surrounding facts showed that the ads were published during a "hotly contested, bitter election in which strong personalities were involved" and that "[i]t is further obvious that the newspaper staff was personally acquainted with many of the principals and was aware of many of the issues and facts from their 'news gathering' activities."

The court of appeals found that "considering the evidence in the light most favorable to Varanese, a jury could reasonably infer that Curran's testimony raised serious doubt as to the truthfulness of the ad. * * * Thus, the record contains evidence from which a jury could determine with convincing clarity that Lake-Geauga Printing Co. published the advertisement with actual malice, that is, with a high degree of awareness of its probable falsity."

It is my conclusion that the court of appeals properly applied the Ohio Civil Rules regarding summary judgment in accord with the standards set forth in the federal cases of *New York Times Co.* v. *Sullivan* (1964), 376 U.S. 254, and *Anderson* v. *Liberty Lobby, Inc., supra,* and within the requirements of Civ. R. 56. The plaintiff presented sufficient evidence to survive summary judgment under these requirements. Therefore, the grant of summary judgment by the trial court was appropriately reversed by the court of appeals.

86

6—The Geauga Times Leader, Mon., Nov. 1, 1982

# We Ask You To Judge For Yourself

# Why Informed Taxpayers Are

## So UPSET With

# BARBARA VARANESE

### IS IT BECAUSE SHE DOESN'T "TELL IT LIKE IT IS"?

Geauga County faces a critical funding situation next year. Your Commissioners will have to use good judgement in resolving major problems.

Varanese is **NOT** the person to run a strong and responsible government. She is noted for creating chaos and conflict—even within her own party. She has a long history of confrontation—and everybody pays for it!!! (1) Her extended legal battles have cost all taxpayers **TENS OF THOUSANDS OF DOLLARS** over the years. (2) Much of her vindictive tirades have been directed toward fellow Democrat, Jim Mueller. She has labeled other office holders as "ignorant, incompetent, malicious, punitive, whining, law-breaking, and irresponsible."(1)

Look at her record as county treasurer for 1981. She consistently misled all of us with her "yellow political journalism".

*JUNE 1981 —County Treasurer Varanese lays off entire staff for month after constantly complaining about budget being cut too much. She neglected to tell voters she gave her staff **three** raises that year. (3)

*JUNE 1981 — Varanese requested the State Commissioner of Taxation to extend tax collection because she had no help to process the tax receipts. Then, she provided him a list of agencies and offices she considered expendable in order to finance **HER** office. (4)

That list consisted of:

*   **ELIMINATE** your Soldier's Relief and Veterans' Services (provides needed emergency relief for all veterans in the county.) (4)
*   **ELIMINATE** your Soil Conservation Service (vital for future generations.) (4)
*   **ELIMINATE** your County Extension Service (no more 4-H programs.) (4)
*   **ELIMINATE** salaries for Division of Aging Director, County Administrator, Restitution staff personnel, and County Planning Commission staff. (4)

Varanese also included as **UNNECESSARY** the **REPAYMENT OF PRINCIPAL** on a note owed by the county and money set aside for capital improvements. Thousands of Geauga residents would be affected by this type of irresponsible action and attitude. Proud Geauga County residents would suffer immeasurable damage if she had her way.

*JULY 1981 — $11,000,000 of UNOPENED TAX RECEIPTS remained in her vault; **idle**, when they could have been earning thousands of dollars interest per day for our county. (5) (6).

*A county bank offered to provide professional help (a legal alternative) to assist in depositing some 15,000 taxpayers' checks. **Varanese refused their help. A Two-Day** job took **ONE MONTH!** (5)

*With all this stalling, Varanese also held in her vault nearly **$250,000.00** worth of undeposited interest checks for almost **two months.** Monies that should have gone into the county general fund account to pay bills. County offices—including her own—suffered severe cash flow problems because spendable income lay unused in the treasurers vault. Creditors threatened to take Geauga County to court for payment of bills. (5)

*It took a threat by the Commissioners to have the State do a cash count audit to finally motivate Varanese to deposit some $250,000.00 into interest-bearing accounts—Typical Varanese confrontation again! (5) (6) (7)

*In 1977, **at Varanese's insistence,** former Prosecutor John Norton rendered an opinion that denied the collection of a .2 mil levy approved by 61% of Geauga voters. (8)

**ONE PERSON SHOULD NOT** be allowed to overrule 61% of the voters. Be careful how you vote on November 2nd. Don't be fooled with halftruths. We need responsible management of your county's resources.

# On November 2nd
# VOTE FOR
# TONY GALL
# FOR GEAUGA COUNTY COMMISSIONER

1. Newspaper articles, Varanese ads and letters, WMKC Radio tapes. 2. Interest case in Supreme Court of Ohio. 3. County payroll records, 1981. 4. Document presented to State Commissioner of Taxation 6/12/81. 5. Newspaper reports - Geauga Times Leader, Plain Dealer, Cleveland Press. 6. Investment and deposit records, Cherdon Savings Bank, Huntington Bank, BancOhio. 7. Telegram from Ferguson's Office, Telephone conversation between employee in State Auditor's Office and Commissioner's Office. 8. Opinion rendered April, 1977, Geauga Times Leader article November 5, 1981.

Paid for by Committee to Elect Tony Gall, Carl Manfredi, Chairman 11260 Kinsman Road, Newbury, Ohio

## Appendix II

"Q. Mr. Curran, would you take a look at Plaintiff's Exhibit Number 1 [the ad], please?

"Mr. Curran, when did you first, when was the first time that you saw this ad?

"A. It would have been either the Thursday or Friday after and prior to its publication.

"Q. All right. And where did you see the ad at that time?

"A. I saw it on the counter in the advertising section of the Geauga Times Leader office.

"Q. At the time you first saw this ad at that location, who else was looking at the ad?

"A. Mr. Herb Thompson.

"Q. All right. Is that the same Mr. Thompson we talked about earlier, general manager?

"A. He was the general manager.

"Q. Okay. And did you look at the ad while Mr. Thompson was also looking at the ad?

"A. Yes, I did.

"Q. And did you peruse it?

"A. Yes, I did.

"Q. And while the ad was laying [sic] there, did you say anything to Mr. Thompson concerning that ad?

"A. Yes, I did.

"Q. And tell these folks what you told Mr. Thompson.

"A. I said it was bullshit.

"Q. And why did you say that?

"A. I said it because it appeared to be, and was, a listing of specific apparent charges from one candidate to another, and using as reference points, these numbers which appeared, which reference to footnotes, and which included in them were the Geauga Times Leader. The Geauga Times Leader was our newspaper, and I said, 'It is bullshit. We can't use this.'

"Q. Why could you not use that, in your judgment?

"A. In my judgment, to have specific charges of possible wrongdoing referring to our newspaper by name as the source of this information would be a problem to us if these charges were not accurate. It would be a problem to us, anyway, because it would' appear that we were supporting one candidate in an advertisement prepared by another. It would appear we were giving it our imprimatur, for one. But, secondly, that we were justifying these charges and the — how can I word it.

"Q. All right. Go ahead, sir.

"A. When you see something that says, '$11,000,000 of unopened tax receipts lay in her vault; idle,' she is the treasurer of the county. Her job is to deal with money, that is her elected position. To say that we said that she misused the money, what if she didn't?

"I said — the term was, 'It is bullshit.' Followed by, 'If these aren't right, at all, in any way, and we get sued, if there is a libel, we can be included because our name is included.'

"Q. In the footnotes?

"A. In the footnotes.

"Q. All right. And did you tell that to Mr. Thompson at that time?

"A. Yes, I did.

"Q. And what did Mr. Thompson tell you in response to your remarks concerning the ad and the footnotes.

"Mr. Speros: Objection.

"Q. Go ahead sir. You can answer.

"A. Oh, I can?

"Q. Yes.

"A. He said, 'Don't worry about it. I will take care of it.'

"Q. All right. Did the ad and the footnotes cause you any other concerns or any other problems that you have not spoken to?

"A. I think you understand the concerns. If an ad or any statement in a newspaper of this nature, if it is proven — if it is wrong, if it is a false ac-

cusation, and we have substantiated it by putting our name to it; one, obviously, we could damage the reputation, but quite frankly —

"Q. Of who [sic]?

"A. The person who was being attacked.

"Q. In this case it was who?

"A. Mrs. Varanese. My thing was, as the editor, as a corporate officer, we can't even get attached in any way to this kind of thing.

"If they want to make the charge, don't make us the spokesperson for the charge, because that ties us to the charge as if we are making it ourselves. There is the appearance that we are supporting the charge.

"Q. All right. And did you tell that to Mr. Herb Thompson?

"A. Yes. I said, 'You know, if these things aren't right and we say they are right because we have our name on here —' even if we were ever to win a libel, let's say if they did sue for libel, we would be included. We are automatically included, obviously, because I would assume that everybody would be named as supporting these charges.

"We don't want to get our name linked to anything that could possibly be wrong. We are talking here about a person who is a treasurer, being accused of not doing her job, possibly holding up money that she would not have the right to hold up, and I had no independent knowledge of it. I had no independent knowledge she had ever been convicted of any of these things or, you know, I don't — of course, I had only been at the paper for a period, but, again, I had no independent knowledge, and I said, 'Herb, what do we know about this?'

"Q. Now, insofar as your concern about this ad and the footnotes to it, you indicated to us that you were concerned that if they were not true, that you could damage the reputation of Barbara Varanese? You have spoken to that point; am I right right [sic], sir?

"A. Yes.

"Q. And the second point was that the statements, did you consider them to be libelous or potentially libelous statements?

"Mr. Speros: Objection.

"Mr. LaFond: Objection.

"Q. Go ahead.

"A. I considered that it was the risk that if they were not totally and absolutely accurate, that then they could be considered libel by some competent authority.

"Mr. Speros: Objection. Move to strike.

"Q. All right. And is that the last conversation you had with Mr. Herb Thompson that day concerning this ad?

"A. He took two or three minutes, and that was it. He said, 'It is none of my concern.' And basically brushed me off, and I turned and went away.

"Q. All right. You continued to work for the Geauga Times Leader after this, sir; is that correct?

"A. Yes.

"Q. And then eventually you left the Geauga Times Leader?

"A. Yes, eventually.

"Q. And when approximately was that, sir?

"A. May 13th, 1983.

"Q. Mr. Curran, in reference to the statement that appears in the body of the ad, the statement that says, 'Varanese also held in her vault nearly $250,000 worth of undeposited interest checks for almost two months.' Did that statement also give you the same concerns you indicated to us here?

"Mr. Speros: Objection.

"Q. Go ahead. You can answer it with an objection. Go ahead.

"A. All right. There were three particular things that hit my eye, the $11,000,000.

"Q. Yes?

"A. With the notation, 5, 6, notating to footnote 5, which was one of ours, Geauga Times Leader.

"The $250,000, somebody holding money in their vault for that kind of period of time, I would assume that would be—for a treasurer, that that would be malfeasance, misfeasance or some kind of nonfeasance of what they are supposed to do with money coming in, and in neither of those cases, I had never seen any stories that she had been convicted or found guilty or whatever the right term would be.

"And the other one—I don't know why this would strike me—would be this one about that, 'At Varanese's insistence, former prosecutor, John Norton denied the—' et cetera, et cetera, et cetera.

"The prosecutor has got his job, Varanese has got her job. I read that as an implication, correctly or wrong, that they are saying that she coerced him.

"Q. Okay.

"A. And Norton, I mean, he can do his own deciding."