**LASERWORKS, A DIVISION OF KING–HALLER ENTERPRISES, INC., Plaintiff–Appellant,**

v.

**PITNEY BOWES, INC., Defendant–Appellee.**

**No. 03–3767.**

United States Court of Appeals, Sixth Circuit.

June 25, 2004.

Gregory S. DuPont, Columbus, OH, for Plaintiff–Appellant.

James A. Wilson, Vorys, Sater, Seymour & Pease, Columbus, OH, for Defendant–Appellee.

Before: MARTIN and SUTTON, Circuit Judges and WILLIAMS, Senior District Judge.*

WILLIAMS, Senior District Judge.

The district court in this case granted summary judgment to Pitney Bowes, Inc., (hereinafter, "Pitney Bowes"), with respect to Laserworks, Inc.'s, (hereinafter, "Laserworks"), claims and granted summary judgment to Laserworks with respect to Pitney Bowes' claims. The appellant, Laserworks, appeals the district court's grant of summary judgment to Pitney Bowes. For the reasons set forth below, we AFFIRM the decision of the district court granting Pitney Bowes' motion for summary judgment.

* The Hon. Glen M. Williams, Senior United States District Judge for the Western District of Virginia, sitting by designation.

## I. STATEMENT OF FACTS AND PROCEDURAL HISTORY

Pitney Bowes is a leading supplier of facsimile machines (hereinafter, "fax machines"). In conducting business. Pitney Bowes sells, leases and services fax machines as well as sells related supplies, such as toner cartridges, throughout the United States. Laserworks is in the business of remanufacturing toner cartridges for several brands of fax machines. Recycled toner cartridges cost substantially less than new toner cartridges, which makes them attractive to many businesses.

In 1994 and 1995, Barbara Lovenscheimer, a sales representative for Pitney Bowes, negotiated agreements with Frigidaire and Rail Van for the lease of numerous fax machines. Lovenscheimer indicated that these companies could utilize recycled toner cartridges in their fax machines as long as these recycled toner cartridges caused no problems with the fax machines. Pitney Bowes retained ownership of the fax machines and agreed to provide maintenance for the machines free of charge. Pursuant to the service agreement, the lessees agreed to "[o]nly use supplies which meet [Pitney Bowes] specifications and ... to discontinue use upon written notice from [Pitney Bowes] of any supplies which are found to increase [the] cost of maintenance or cause damage to the Equipment." In addition, the lessee agreed to "[p]ay for any repairs or replacements made necessary by the Customer's willful or negligent acts[.]" Lovenscheimer warned lessees that if the use of certain recycled cartridges caused problems, that Pitney Bowes would service the fax machine once free of charge, and that the customer would be billed for any subsequent service calls resulting

from the use of the same recycled toner cartridges.

At the time the service agreements between Frigidaire and Pitney Bowes and Rail Van and Pitney Bowes were entered into, Pitney Bowes sold only new toner cartridges; therefore, to accommodate her customer's desire for the less expensive recycled cartridges, Lovenscheimer specifically mentioned to Frigidaire some manufacturers of recycled toner cartridges, including Laserworks. In November 1995, Frigidaire began to use Laserworks recycled toner cartridges in its Pitney Bowes fax machines. Before November 1995, Laserworks did not sell recycled toner cartridges for Pitney Bowes fax machines. Rail Van began to use Laserworks recycled toner cartridges in its Pitney Bowes fax machines in January 1996.

Both Frigidaire and Rail Van leased several Pitney Bowes 9700 series fax machines; these machines were high-volume machines that ran virtually non-stop. In early 1996, both Frigidaire and Rail Van began experiencing chronic malfunctions of their Pitney Bowes fax machines; these malfunctions all resulted from the same problem—an excessive build-up of toner on the fuser rollers. Jeffrey Haller, President of Laserworks, recommended a program of preventive maintenance, which his company would provide at no charge. However, Pitney Bowes refused to allow this unless the lessees agreed to be fully responsible for any damage cause by Laserworks during this preventive maintenance. The lessees refused to acquiesce to this demand. As a result, service calls to Pitney Bowes because of the toner build-up problem were frequent, occurring approximately once per week.

Originally, Pitney Bowes serviced the fax machines at Frigidaire and Rail Van for free: however, as the problems continued, Pitney Bowes attempted to determine the cause of the malfunctions. In the spring of 1996, customer service records indicate that Pitney Bowes' technicians concluded that the toner build-up problems were being caused by the customers' use of Laserworks recycled toner cartridges. Consequently, Pitney Bowes' representatives informed the customers that if they continued to use Laserworks recycled toner cartridges, that they would be billed for all future service calls related to the same problem of excessive toner build-up. Specifically, the service technicians for Pitney Bowes suspected that the type of toner used in Laserworks recycled toner cartridges was incompatible with the Pitney Bowes machines, or that the build-up on the fuser rollers was created by poor humidity control, dust control, or the use of improper cleaning products during Laserworks' remanufacturing process. Laserworks denied these accusations.

On May 2, 1996, Mike Armstrong of Pitney Bowes sent an internal memorandum to Dan Baker of Pitney Bowes, discussing the continuing problems with the fax machines at Frigidaire and Rail Van. This memorandum proposed that Dan Baker coordinate with the local service technicians to implement the following test: to identify fax machines that the customer could monitor, install new fixing units and rollers, install new Pitney Bowes toner cartridges and compare the performance of these machines with machines outfitted with Laserworks recycled toner cartridges that also would be outfitted with new fixing units and rollers. Such a test was conducted at Rail Van, and the machine equipped with the Laserworks recycled toner cartridge malfunctioned first; the test was then terminated. However, the machine equipped with a new Pitney Bowes toner cartridge failed some time after the test was terminated.

On July 11, 1996, Mike Sherill of Pitney Bowes sent an internal memorandum to

Richard Kalinowski of Pitney Bowes, which indicated that the specified test was conducted at both Frigidaire and Rail Van and that the results showed that the customers' use of Laserworks recycled toner cartridges was the cause of the malfunctions. The internal memorandum also indicated that all service technicians were instructed to charge all fax customers for any service calls necessitated by the use of Laserworks recycled toner cartridges after an initial warning in writing. Sherill commented that "together we can convince all of our customers to use only Pitney Bowes products. If we can achieve this it will be a win/win situation for Sales and Service."

In what the district court described as a "fortunate coincidence for the company," Pitney Bowes introduced its own line of recycled toner cartridges at the same time that it diagnosed the problems with the Laserworks recycled toner cartridges. Lovenscheimer then convinced Rail Van to discontinue its use of Laserworks supposedly problematic recycled toner cartridges and to begin purchasing and using Pitney Bowes recycled cartridges in July 1996. Frigidaire continued to use Laserworks recycled toner cartridges even though Pitney Bowes continued to charge them for any service calls for problems caused by the Laserworks toner cartridges.

Laserworks then filed a complaint in the United States District Court for the Southern District of Ohio at Columbus seeking damages and permanent injunctive relief for both federal antitrust claims as well as associated state law claims. The district court granted summary judgment to Pitney Bowes on the federal antitrust claims and dismissed the pendent state law claims. This court upheld that decision. The instant case was filed in the Court of Common Pleas, Franklin County, Ohio, on Laserworks' state law claims alleging violations of the Ohio Valentine Act, OHIO REV.CODE § 1331.01 *et seq.*, and the Ohio

Deceptive Trade Practices Act, OHIO REV. CODE § 4165.02. In addition. Laserworks asserted common law claims for unfair competition and unfair and deceptive trade practices. Pitney Bowes then removed this action to federal court on the basis of diversity jurisdiction and filed a four-count counterclaim, alleging violations of OHIO REV.CODE § 4165.02 and asserting common law claims of unfair competition and unfair and deceptive trade practices, tortious interference with a contractual relationship and negligence. The district court granted Pitney Bowes' motion to dismiss Laserworks' Ohio Valentine Act claim on the basis of collateral estoppel. Pitney Bowes and Laserworks then filed cross-motions for summary judgment on the remaining claims of trade disparagement, tortious interference with a contractual relationship and negligence. The district court granted Pitney Bowes' motion for summary judgment with respect to Laserworks' claims and granted Laserworks' motion for summary judgment with respect to Pitney Bowes' counterclaims.

Laserworks then appealed that decision to this court.

## II. STANDARD OF REVIEW

A district court's grant or denial of a motion for summary judgment is reviewed de novo. *City of Mount Clemens v. U.S. EPA*, 917 F.2d 908, 914 (6th Cir.1990). The standard of review for a motion for summary judgment is well-settled; a motion for summary judgment should be granted only when the pleadings, responses to discovery and record reveal that "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106

S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Hamby v. Neel*, 368 F.3d 549, 556 (6th Cir.2004). A genuine issue of fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.

In considering a motion for summary judgment, this court must view the facts and the reasonable inferences to be drawn from those facts in the light most favorable to the party opposing the motion. *See Anderson*, 477 U.S. at 255; *Matsushita*, 475 U.S. at 587–88; *Hamby*, 368 F.3d at 556; *Williams v. Int'l Paper Co.*, 227 F.3d 706, 710 (6th Cir.2000). However the moving party need not support its motion with evidence disproving the nonmoving party's claim, but need only show that there is an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 325.

In diversity cases filed pursuant to 28 U.S.C. § 1332, the district court must apply the choice of law rules of the state in which the court sits. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In effect, this court also sits as a court in the forum state, Ohio, and, therefore, must apply Ohio's choice of law rules as well. *See Graham v. Am. Cyanamid Co.*, 350 F.3d 496, 506 (6th Cir.2003) (citing *Muncie Power Prods., Inc. v. United Techs. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir.2003)). In a case that involves alleged tortious conduct, Ohio's Supreme Court has stated that the law of the place of the injury is presumed to govern. *See Morgan v. Biro Mfg. Co., Inc.*, 15 Ohio St.3d 339, 474 N.E.2d 286, 288–89 (Ohio 1984). In the case at bar, the alleged tortious conduct (the disparaging statements) were uttered in Ohio; therefore, Ohio's law will govern.

## III. ANALYSIS

In the case at bar, three issues were raised upon appeal: (1) whether the district court erred when it found that Pitney Bowes' statements were entitled to the protection of the defense of qualified privilege; (2) whether the district court erred in finding that Laserworks failed to raise a genuine issue of material fact as to whether Pitney Bowes acted with actual malice toward Laserworks; and (3) whether the district court erred in granting Pitney Bowes' motion for summary judgment.

### A. Qualified Privilege

■ Laserworks argues that the district court erred in finding that the statements made by Pitney Bowes' representatives regarding Laserworks recycled toner cartridges were protected by qualified privilege. In order for a party to maintain a cause of action for trade defamation under Ohio law, four elements must be proven: "(a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." *Akron–Canton Waste Oil, Inc. v. Safety–Kleen Oil Servs., Inc.*, 81 Ohio App.3d 591, 611 N.E.2d 955, 962 (Ohio Ct.App.1992), *cert. denied*, 65 Ohio St.3d 1458, 602 N.E.2d 254 (Ohio 1992). In the present case, the district court did not reach the issues of falsity, fault or actionability because the district court concluded that the statements made by Pitney Bowes' representatives concerning the cause of the malfunctions were subject to a qualified privilege.

The Ohio Supreme Court in *Hahn v. Kotten*, 43 Ohio St.2d 237, 331 N.E.2d 713 (Ohio 1975), set forth the law controlling the defense of qualified privilege. Accord-

ing to the Ohio Supreme Court, "[a] qualified privilege is recognized in many cases where the publisher and the recipient have a common interest, and the communication is of a kind reasonably calculated to protect or further it." *Hahn,* 331 N.E.2d at 718. In addition, that court noted that "[t]he essential elements [of a qualified privilege] are good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only." *Hahn,* 331 N.E.2d at 719 (quoting 50 Am.Jur.2d, *Libel and Slander* § 195). The district court concluded that Pitney Bowes satisfied each of these elements, and this court finds no reason to disturb the conclusions of the district court.

Laserworks contends only that the district court erred in determining that the statements made by Pitney Bowes' representatives were made in good faith; Laserworks does not argue that the district court erred in determining that the other elements were satisfied. Therefore, discussion of only the good faith element is necessary.

As stated in *Hahn,* the first element that must be proven is that the statements were made in good faith. *Hahn,* 331 N.E.2d at 719 (quoting 50 Am.Jur.2d, *Libel and Slander* § 195). Laserworks argues that the district court wrongly "presumed an innocent motive and, therefore, good faith." The court in *Hahn* noted that good faith exists where the relationship between the publisher of the statements and the recipient of the statements is of such a nature as "to afford reasonable ground for supposing an innocent motive for giving information, and to deprive the act of an appearance of officious intermeddling with the affairs of others." *Hahn,* 331 N.E.2d at 720 (citing *West v. Peoples Banking & Trust Co.,* 14 Ohio App.2d 69, 236 N.E.2d 679, 682 (Ohio Ct.App.1967)). In addition, the court in *Hahn* noted that "[i]t is generally held that if the defendant publishes the defamatory words to the person interested at the latter's request or solicitation, there is such a relationship between the parties to justify the communication." *Hahn,* 331 N.E.2d at 720 (citing *West,* 236 N.E.2d at 682).

In the instant case, the district court correctly found that there was no genuine issue of material fact with regard to whether the statements were made in good faith. The undisputed facts show that Pitney Bowes entered into service agreements with Frigidaire and Rail Van. These service agreements provided that Pitney Bowes would retain ownership of the leased fax machines, and that Pitney Bowes would service the machines as needed at no charge unless the need for service was caused by the use of unapproved parts or the negligence of the lessee. When the companies requested service from Pitney Bowes on malfunctioning fax machines, the companies were entitled to be informed as to what was causing the malfunctions; therefore, these companies essentially requested or solicited this information from Pitney Bowes, which "afford[s a] reasonable ground for supposing an innocent motive for giving information." *Hahn,* 331 N.E.2d at 720. As a result, Pitney Bowes was obligated when the fax machines malfunctioned to ascertain the reason for the malfunction and to service the inoperable fax machine. Pitney Bowes had an existing interest in protecting its business relationship with its customers because of the existing contracts. Had Pitney Bowes failed to service the machines or make reasonable efforts to ascertain the cause of the chronic malfunctions, its business reputation would have been harmed. After servicing the machines in the field, Pitney Bowes' representatives ascertained that the cause of the chronic malfunctions was the use of Laserworks

recycled toner cartridges. After this discovery, Pitney Bowes informed Frigidaire and Rail Van that any subsequent service calls related to the same problem would be charged a service fee. Pitney Bowes had a compelling interest in divulging this information to its customers before it began to charge them for subsequent service. Therefore, the district court's finding of good faith is not in error, and the district court did not err in finding that the statements of the Pitney Bowes' representatives were protected by the defense of qualified privilege.

### B. Actual Malice

To defeat a qualified privilege a party is required to prove "by clear and convincing [evidence] that the communication was made with actual malice." *A & B–Abell Elevator Co., Inc. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council,* 73 Ohio St.3d 1, 651 N.E.2d 1283, 1292 (Ohio 1995) (quoting *Jacobs v. Frank,* 60 Ohio St.3d 111, 573 N.E.2d 609, 614 (Ohio 1991)). Actual malice was defined by the Ohio Supreme Court in *A & B–Abell Elevator Co., Inc.,* as "acting with knowledge that the statements are false or acting with reckless disregard as to their truth or falsity." *A & B–Abell Elevator Co., Inc.,* 651 N.E.2d at 1292 (quoting *Jacobs,* 573 N.E.2d at 614). Reckless disregard may be established by clear and convincing proof that "the false statements were made with a *'high degree of awareness of ... probable falsity,'* ... or that 'the defendant in fact entertained *serious doubts* as to the truth of his publication.'" *Blatnik v. Avery Dennison Corp.,* 148 Ohio App.3d 494, 774 N.E.2d 282, 291 (Ohio Ct.App.2002) (quoting *Varanese v. Gall,* 35 Ohio St.3d 78, 518 N.E.2d 1177, 1180 (Ohio 1988)) (emphasis in original). "Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to

be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases." *Cross v. Ledford,* 161 Ohio St. 469, 120 N.E.2d 118, 123 (Ohio 1954). In determining whether the statements were made with actual malice, the court must look to the time the allegedly defamatory statements were made. *Dupler v. Mansfield Journal Co., Inc.,* 64 Ohio St.2d 116, 413 N.E.2d 1187, 1193 (Ohio 1980).

■ The district court found that Laserworks failed to present clear and convincing evidence that the statements of the Pitney Bowes' representatives were uttered with actual malice. Laserworks argues that the district court's decision "that actual malice was not present was driven by two errors," those being that the district court "disregarded defamatory statements that were made after the comparison test was conducted and the court inappropriately concluded that the malfunctions only occurred when the Laserworks cartridges were used."

It is clear from the record that Pitney Bowes' representatives began informing Frigidaire and Rail Van in April 1996 that their fax machines were malfunctioning because of the use of Laserworks recycled toner cartridges, stating that the toner from these cartridges was building up on the fuser rollers. Laserworks argues that the district court allegedly failed to consider defamatory statements made in the summer of 1996; however, Laserworks has failed to cite any evidence contained in the record to support this contention. In the deposition of Christine Danflous, she mentions the fact that her company, Rail Van, quit using Laserworks cartridges in July 1996 because Pitney Bowes began billing them for service calls related to those toner cartridges. This was after a test re-

vealed that a fax machine equipped with a Laserworks toner cartridge had been proven to malfunction before a fax machine equipped with a Pitney Bowes toner cartridge malfunctioned. In the district court, the only evidence of alleged disparaging statements made by Pitney Bowes' representatives was customer service records from April 1996. No evidence was presented by Laserworks that indicated that Pitney Bowes' representatives made any statement disparaging Laserworks cartridges after the comparison test conducted in the spring of 1996. The only evidence in the record is that after the spring of 1996, Pitney Bowes began billing its customers for service calls that involved Laserworks cartridges.

The district court rightly stated:

In hindsight, there is considerable evidence that the chronic malfunctions were not caused by the customers' use of Laserworks cartridges, but rather by a lack of adequate preventative maintenance. Nevertheless, the only relevant inquiry at this stage of the litigation is whether there is clear and convincing evidence that, at the time Pitney Bowes' employees made the allegedly disparaging statements, they either knew that the statements were false, or acted with reckless disregard as to their truth or falsity.

In this case, Laserworks failed to produce evidence that the Pitney Bowes' representatives' statements were made knowing that the statements were false or that the statements were made with reckless disregard as to their truth or falsity. As stated earlier, customer service records from April 1996 indicate that this was the first time that Pitney Bowes' representatives informed Frigidaire and Rail Van that their fax machines were malfunctioning because of their use of Laserworks recycled toner cartridges. In addition, the lease agreements between Pitney Bowes and Frigidaire and Pitney Bowes and Rail Van indicated that if the need for service was caused by the use of parts that did not meet Pitney Bowes' specifications that the customer would be charged for the service call. Pursuant to the terms of these lease agreements, Pitney Bowes' representatives informed Frigidaire and Rail Van in April 1996 that, if they continued to use Laserworks toner cartridges, then Frigidaire and Rail Van would be responsible for any subsequent service calls necessitated by a malfunction caused by a Laserworks toner cartridge. Eventually, Pitney Bowes did charge these customers for subsequent service calls, but only after determining through the use of a test that a fax machine equipped with a Laserworks cartridge failed before a fax machine equipped with a Pitney Bowes cartridge.

Laserworks argues that the district court disregarded evidence that the malfunctions occurred with cartridges other than Laserworks cartridges. However, the fact that Frigidaire or Rail Van experienced problems from use of any other manufacturers' toner cartridges is not evidence that Pitney Bowes acted with actual malice. In fact, that information is not relevant to the question of whether the statements of Pitney Bowes' representatives that Laserworks recycled toner cartridges caused the malfunctions with Frigidaire's and Rail Van's fax machines were uttered knowing they were false or were uttered with disregard as to their truth or falsity. The district court properly did not consider that problems also had arisen with other brands of recycled toner cartridges.

The evidence that is present in the record falls far short of proving that when Pitney Bowes' representatives uttered these statements they knew them to be false or that in uttering these statements that they did so with reckless disregard as

to their truth or falsity. As stated above, actual malice must be ascertained at the time the statements were uttered, not in hindsight. *Dupler*, 413 N.E.2d at 1193. The evidence present in the record supports the conclusion of the district court that, at the time these statements were made, Pitney Bowes' representatives did not know them to be false nor did they utter the statements with reckless disregard as to their truth or falsity; therefore, the district court did not err in finding that Laserworks failed to prove actual malice on the part of Pitney Bowes.

### C. The District Court's Grant of Summary Judgment to Pitney Bowes

Finally, Laserworks argues that the district court erred in granting Pitney Bowes' motion for summary judgment. Based on the fact that Laserworks failed to prove that Pitney Bowes' representatives' statements were not made in good faith and that the statements of Pitney Bowes' representatives were uttered with actual malice, which were Laserworks' only assignments of error. Laserworks fails to show that the district court's grant of summary judgment to Pitney Bowes was in error. Thus, we hold that the district court properly granted Pitney Bowes' motion for summary judgment.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's order granting Pitney Bowes' motion for summary judgment.