OPINION
Plaintiffs, John and Cynthia Scaccia, appeal from an interlocutory order disqualifying their trial counsel, Dwight D. Brannon, from representing the Scaccias in this proceeding.
The order from which this appeal is taken did not dispose of all issues which the Plaintiffs' claims for relief present. Ordinarily, we would be without jurisdiction to review the error assigned absent a certification by the trial court pursuant to Civ.R. 54(B) that there is no just reason for delay of appellate review. However, Civ.R. 54(B) applies per its terms to orders disposing of a claim for relief, and the trial court's disqualification order is a provisional remedy. Therefore, because the order satisfies the terms of R.C. 2505.02(B)(4) and the tests set out therein, it is final, and therefore appealable per R.C. 2505.03, notwithstanding the lack of a Civ.R. 54(B) certification. See Premier Health Services, Inc., et al. v. Norman Schneiderman, M.D., et al., Montgomery App. No. 18795, Decision and Entry dated August 21, 2001.
The underlying action is on claims for relief alleging defamation. The alleged defamatory statements were made by Defendants in a series of articles published in the Dayton Daily News. The articles concerned dealings between the Scaccias and an elderly neighbor, which involved allegedly improper transfers of approximately $500,000 of the man's assets by the Scaccias to themselves over a period of several years.
John Scaccia is an attorney. He held a power of attorney for his elderly neighbor while Cynthia Scaccia acted as the man's care giver. When the allegedly improper transfers of money took place, John Scaccia was chief of the criminal section of the City of Dayton's Law Department. He was reportedly under consideration for the position of Dayton Law Director when the later articles which form the basis of the Scaccias' complaint were published in the Dayton Daily News. The newspaper obtained the facts it reported from interviews and from investigations by the Montgomery County Prosecutor's Office and proceedings in the Probate Court.
The Scaccias commenced the underlying action against Dayton Newspapers, Inc. ("DNI"), publisher of the Dayton Daily News, and numerous other Defendants connected with it, on September 13, 1999. The complaint was filed on behalf of the Scaccias by Attorney Dwight D. Brannon. The Defendants answered, denying the material allegations of the complaint.
On April 4, 2000, the Defendants moved to disqualify Attorney Brannon from further representing the Scaccias in the proceeding, stating that they anticipated that Brannon would be called as a witness to testify. That assertion was supported by affidavits of two Dayton Daily News reporters, Rob Modic and Wes Hills, also Defendants herein, who stated that Brannon was a lead for the stories the Defendants published. The reporters stated that Brannon had suggested to them that he represented the Scaccias and that his clients' conduct in their dealings with their elderly neighbor was improper. The Defendants argued that the reporters would so testify, and that their testimony would be offered to prove the Defendants' state of mind. That evidence, they argued, would require Brannon to take the stand to rebut the reporters' testimony.
The trial court granted the motion to disqualify Attorney Brannon, applying the test prescribed in Mentor Lagoons, Inc. v. Rubin (1987),31 Ohio St.3d 256. The court found that evidence of Brannon's contacts with the two reporters was relevant to the issues involved in the action and, therefore, admissible to prove or defend against the claims for relief involved. The court also found that Brannon's own testimony concerning those matters would be useful to the Scaccias in rebutting the reporters' versions of what had happened between them and Brannon.
The Scaccias filed a timely notice of appeal from the order disqualifying Attorney Brannon. They present five assignments of error for review.
FIRST ASSIGNMENT OF ERROR
 THE TRIAL COURT COMMITTED PREJUDICIAL ERROR OF FACT AND LAW IN ITS DECISION OF JUNE 30, 2000, DISQUALIFYING APPELLANTS TRIAL COUNSEL, HOLDING THAT APPELLEES ALLEGED CONVERSATIONS COULD PROVIDE LEGAL JUSTIFICATION FOR THE CONTENTS OF THE DEFAMATORY ARTICLES, FORCING COUNSEL TO BE A WITNESS AND FURTHER, SUA SPONTE, HOLDING THAT CONTACTS IN SEPTEMBER 1998 COULD NOT BE ADMISSIBLE EVIDENCE AGAINST APPELLEES.
A court has the duty and responsibility to regulate the conduct of the attorneys who appear before it. 155 North High, Ltd. v. Cincinnati Ins. Co. (1995), 72 Ohio St.3d 423. Thus, the trial court possesses the authority to disqualify an attorney from representing clients before the court if the court finds that the attorney cannot conduct that representation in compliance with the Code of Professional Responsibility. Mentor Lagoons, supra.
We may not disturb a trial court's ruling on disqualification absent an abuse of discretion. 155 N. High, supra. An abuse of discretion connotes more than a mere error of law or judgment; it implies that the trial court's decision was unreasonable, unconscionable or arbitrary. AAAA Enterprises, Inc. v. River Place Comm. Urban Redevel. Corp. (1990),50 Ohio St.3d 157.
The Code of Professional Responsibility sets forth the standards governing the practice of law. 155 N. High, supra. The Code is comprised of three parts: Canons, Ethical Considerations, and Disciplinary Rules. Id. While the Canons are "statements of axiomatic norms" and the Ethical Considerations merely "aspirational in character," the Disciplinary Rules are "mandatory in character" because they "state the minimum level of conduct below which no lawyer can fall." Id. (quoting Preface, Code of Prof. Resp.).
Disciplinary Rule 5-101, "Refusing Employment when the Interests of the Lawyer may impair the Lawyer's Independent Professional Judgment," states in pertinent part:
 (B) A lawyer shall not accept employment in contemplated or pending litigation if the lawyer knows or it is obvious that the lawyer or a lawyer in the firm ought to be called as a witness, except that the lawyer may undertake the employment and the lawyer or a lawyer in the firm may testify:
 (1) If the testimony will relate solely to an uncontested matter.
 (2) If the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony.
 (3) If the testimony will relate solely to the nature and value of legal services rendered in the case by the lawyer or the firm to the client.
 (4) As to any matter, if refusal would work a substantial hardship on the client because of the distinctive value of the lawyer or the firm as counsel in the particular case.
DR 5-102, "Withdrawal as Counsel when the Lawyer becomes a Witness," states as follows:
 (A) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial, except that he may continue the representation and he or a lawyer in his firm may testify in the circumstances enumerated in DR 5-101(B) (1) through (4).
 (B) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm may be called as a witness other than on behalf of his client, he may continue the representation until it is apparent that his testimony is or may be prejudicial to his client.
"Disqualification is a drastic measure which should not be imposed unless absolutely necessary." Waliszewski v. Caranova Builders, Inc. (1998), 127 Ohio App.3d 429, 433. The procedure which a trial court must follow in deciding disqualification requests was set out in Mentor Lagoons, supra:
 When an attorney representing a litigant in a pending case requests permission or is called to testify in that case, the court shall first determine the admissibility of the attorney's testimony without reference to DR 5-102(A). If the court finds that the testimony is admissible, then that attorney, opposing counsel, or the court sua sponte, may make a motion requesting the attorney to withdraw voluntarily or be disqualified by the court from further representation in the case. The court must then consider whether any of the exceptions to DR 5-102 are applicable and, thus, whether the attorney may testify and continue to provide representation. In making these determinations, the court is not deciding whether a Disciplinary Rule will be violated, but rather preventing a potential violation of the Code of Professional Responsibility.
Id. Syllabus by the Court, paragraph 2.
DNI argued in the trial court, and it argues here, that Attorney Brannon will be required to testify as a witness on the Scaccias' behalf to rebut the testimony of DNI's two reporters. DNI states that it will offer the reporters' testimony to disprove the Scaccias' claim that DNI acted with the condition of mind required for defamation when it published the stories concerned. That condition of mind is actual malice. (See pp. 18-22, infra.)
DNI's motion to disqualify Brannon was supported by the affidavits of the two Dayton Daily News reporters who wrote the articles concerning the Scaccias, Rob Modic and Wes Hills. In their affidavits, Modic and Hills state that in July 1998, before speaking with Brannon, they "learned of an investigation by the Montgomery County, Ohio Prosecutors' office involving dealings between an elderly man and City of Dayton Prosecutor John J. Scaccia and his wife Cynthia M. Scaccia." Modic Aff. para. 6; Hills Aff. para. 6. When the reporters learned that Brannon represented John Scaccia, Hills called Brannon to discuss the matter.
Affiant [Hills] told Brannon that he had information as to said investigation and understood that Brannon represented John Scaccia. Brannon confirmed the investigation and said that he had initially refused to become involved in it because he believed what he had done was unethical. Brannon said the he did not want his name associated with a story and [Hills] agreed that Brannon would be a "no-attribution source" (i.e., the information provided would not be attributed to the source in a published article).
Brannon told [Hills] that John Scaccia's wife, Cynthia, was the elderly man's caretaker and that he had given hundreds of thousands of dollars to John and Cynthia Scaccia. Brannon indicated that he was troubled by the pattern of giving by the elderly man, who he said had short-term memory problems, and that the elderly man had signed multiple checks for thousands of dollars dated the same day which were written by Cynthia Scaccia to herself. Brannon further indicated that he was disgusted with John Scaccia's behavior. "It stinks," Brannon said. Brannon stated that John Scaccia had violated at least two cannons (sic) of ethics regarding an attorney's fiduciary responsibility to clients and that he could be taken before the bar association ethics committee. Brannon said that he had urged John Scaccia to give the money back to the elderly man.
Per Brannon, the elderly man had given a durable power of attorney naming John Scaccia. Brannon also told [Hills] that John Scaccia had helped the elderly man make contributions to the Dayton Foundation. Brannon mentioned that John Scaccia had assisted the elderly man with his taxes and that amended tax returns were required. Brannon further stated that he, Brannon, had refused to represent the elderly man in the competency proceedings. Brannon also revealed that John Scaccia was under consideration for the then-open position of City of Dayton, Ohio Law Director, a fact which came as a surprise to [Hills]. Brannon noted that this issue with the elderly man would probably cost John Scaccia that job. Brannon suggested that [Hills] talk to Crofford ("Croff") Macklin, a Dayton, Ohio attorney with whom [Hills] was unfamiliar, because Macklin had represented the elderly man, had been concerned about his competency and had refused to go along with Scaccia's plan to take the elderly man's money;
 8. The information which Brannon provided [Hills] in the referenced telephone call between Brannon and [Hills] was key information which led [Hills] to believe that the investigation was a story that should be strongly pursued;
 9. [Hills] spoke with Modic after the referenced telephone call between Brannon and [Hills] and, based upon the information from Brannon, Modic agreed with [Hills] that the story should be strongly pursued. [Hills] then went to Steve Sidlo, the DDN Managing Editor and one of the Defendants in the above-captioned matter, outlined the current information [Hills] and Modic had as to the story and requested additional reporting assistance in pursuing the story. James Bebbington, a DDN reporter and one of the Defendants in the above-captioned action, was assigned to help out with the story as a result of that contact with Sidlo. This happened on or around July 22, 1998. . . .
Hills Aff. para. 7-9.
In Modic's affidavit, he states that after that they decided to pursue the story, and that Brannon allegedly approached him as well.
 10. In late July or August 1998, Brannon approached Affiant [Modic] in the county courts building and gestured for [Modic] to step into the stairwell with him. Brannon indicated that he had talked to Hills about the "Scaccia thing." Brannon shook his head and said that Scaccia had been stupid and that he never should have taken the money. He went on to indicate that he was personally appalled by Scaccia's conduct, but felt that he had to represent him. Brannon further stated that Scaccia should have at least found another attorney to stand between himself and the elderly man and, if Brannon had been in that situation, he would have returned the money. This conversation was on a "background" basis, which means that it is "off the record" (i.e., the source will not be quoted in a published article nor will there be a direct use of the information from the source in a published article).
 "Background" sources are useful ways to obtain information that may later be verified by a source to which the information can be attributed;
 11. While hearings were held in the competency proceedings involving the elderly man on July 22 and 30, 1998 and August 17, 1998, those hearings were closed and we ([Modic], Hills and Bebbington) were unable to obtain much information as to what was transpiring in the hearings or as to the records involved in the proceedings. Ultimately, on September 4, 1998, the Montgomery County Prosecutor's office released documents related to the elderly man's case to [Modic] and Hills in response to [Modic]'s public records request. This material provided a great deal of detailed information about the case. . . .
Modic Aff. para. 10-11.
Brannon's affidavit, submitted to the trial court in support of the Plaintiff's Memorandum in Opposition to the Motion to Disqualify, states that Hills and Modic's affidavits "are misrepresentations of the actual facts and attempt to wrongly extend their beliefs and knowledge to Affiant." Brannon Aff. para. 7. Brannon states that "it was clear" during his discussions with Hills and Modic that "they were operating with information supplied by the prosecutor's office and other sources." Id. at para. 9. Brannon states that he never expressed to the reporters "any knowledge of any `pattern of giving' or check writing," but only that if John Scaccia exploited the elderly man as both the drafter and the heir of his will, or otherwise violated a disciplinary rule, it would be an ethics violation. Id. at para. 25, 26. Brannon states that he never expressed "any facts or conclusions that Mr. Scaccia was `guilty' or that his conduct would `stink.'" Id. at para. 28.
Brannon concludes his affidavit with the following statements:
 49. The actual facts and records were available or known to defendants well before they were to [Brannon]. Mr. Hills and Mr. Modic both admit knowledge of an investigation as early as May or June, 1998. Both awaited the development of the facts through the probate hearing.
 50. Any discussions about the Plaintiffs' conduct prior to August 28, 1998, would be irrelevant in light of the facts disclosed by the Probate Court's hearings and Decision.
 51. Any alleged statement by counsel would have been corrected by a review of these facts unavailable prior to any publication.
Brannon Aff. para. 49-51.
The parties waived a hearing on DNI's motion and asked the court to rule on the basis of the affidavits of Modic, Hills, and Brannon. The court did so, and it granted the motion. The court found that Brannon's testimony would be useful to rebut the testimony of Modic and Hills. Concerning the admissibility of the reporter's evidence concerning their contact with Brannon, the court stated:
 [T]he substance of Brannon's contacts with the Defendants in July 1998 is relevant to many of the Scaccias' causes of action. The Scaccias assert that the Defendants acted `negligently, recklessly, intentionally, and/or with actual malice' in the publishing of the articles, by invading the Scaccia's privacy, and generally by their acts or omissions. Since the Defendants contend that the contacts with Brannon led them to believe that a story about the Scaccias was one that needed to be pursued, the substance of the conversations could clearly be used to show that they did not in fact act negligently, recklessly and intentionally. The Defendants could use the alleged statements by Brannon to prove that they had a solid basis for their articles.
 The Defendants can also use these communications taking place in July 1998 that they did not publish the articles with knowledge of their falsity or with reckless disregard of the truth. If, as the Defendants contend, Brannon was a source in the formulation of the articles, the Defendants would most likely call him to testify on the substance of the July 1998 conversations to show that the Defendants had no knowledge of their falsity. Brannon's testimony could show that the Defendants had a solid foundation for their story. By using a reasonable source to gain information, the Defendants can show that they did not recklessly disregard the truth.
 Testimony by Brannon will be relevant to the Scaccias in refuting testimony given by the Defendants to the contacts at issue. Since Brannon disputes the substance of many of the contacts, he is the only available witness for the Scaccias to rebut any testimony given by the Defendants. His testimony would be essential to the Scaccias in showing that the Defendants had no foundation on which to base their stories and thus acted negligently, recklessly, intentionally, and/or with actual malice."
Decision, Order and Entry, June 30, 2000, at pp. 4-5.
The trial court's disqualification of Attorney Brannon was founded on DR 5-102(A), which applies when a witness asks to testify for his own client. The court did not also rely on DR 5-102(B), which applies when an attorney is called as a witness by an adverse party. DNI argues that the court should have applied DR 5-102(B) as well.
At oral argument, both sides disavowed any intention to produce Attorney Brannon's testimony in their respective cases-in-chief. Defendants argue that the testimony of their own witnesses, specifically the reporters who had contact with Brannon, will compel Attorney Brannon to testify in rebuttal in order to attack it. Attorney Brannon states that he will not, suggesting that his cross-examination of the Defendants' witnesses will likely suffice. Therefore, we are not required to consider whether a violation of DR5-102(B) is possible, the Defendants having disclaimed any intent to call Brannon as their witness. However, if Brannon might later ask to testify in the Scaccias' case in rebuttal, a violation of DR-105(A) remains possible.
At this stage, it cannot be known whether Plaintiffs will present any case in rebuttal. Whether one is presented and what it may consist of depends on what evidence the Defendants offer in their own case-in-chief and how effective the Plaintiffs' cross-examination of DNI's witnesses proves to be. There may be nothing for the Plaintiffs to rebut, and will be nothing if the trial court grants a directed verdict at the close of the Plaintiffs' or the Defendants' case. However, those propositions are now only speculative.
We must assume then, for purposes of our decision, that the Defendants will call the two Dayton Daily News reporters who allegedly received information from Brannon regarding the Scaccias' involvement with their elderly neighbor to testify at trial. Assuming that, we must first determine whether their testimony regarding their contacts with Brannon is admissible. Only and if it is will Brannon's testimony in rebuttal even be required. Mentor Lagoons, supra.
Our resolution of the issue requires a brief detour into the constitutional underpinnings of a defamation claim. In New York Times v. Sullivan (1964), 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, the Supreme Court brought defamation into the constitutional realm. There the court held that a higher standard, actual malice, applies to actions brought by public officials against critics of their official conduct. Id. Actual malice prohibits a public official from recovering any damages for a defamatory falsehood unless he proves that the communication was made "with knowledge that it was false or with reckless disregard of whether it was false or not." Id. at 280, 84 S.Ct. at 726,11 L.Ed.2d at 706.
The Court offered guidance on who exactly qualifies as a "public official" in Rosenblatt v. Baer (1966), 383 U.S. 75, 86 S.Ct. 669,15 L.Ed.2d 597. The public official plaintiff must have, or appear to have, substantial responsibility or control over public affairs, and his position must have such "apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees. . . ." Id. at 86,86 S.Ct. at 676, 15 L.Ed.2d at 606. In practice, the public official category has been extended broadly. See Arnheiter v. Random House, Inc. (C.A.9, 1978), 578 F.2d 804 (naval officer); Gray v. Udevitz (C.A.10, 1981),656 F.2d 588 (policeman); Grzelak v. Calumet Pub. Co., Inc. (C.A.7, 1975), 543 F.2d 579 (mid-level municipal employee). We find that John Scaccia's position at the time of the alleged defamation as the chief of the criminal section of the City of Dayton Law Department meets the public official test.
However, for our purposes the closer question may be whether the conduct giving rise to the articles at issue are purely private matters, outside of the scope of John Scaccia's duties as the head of the City's criminal division. In Garrison v. Lousiana (1964), 379 U.S. 64,85 S.Ct. 209, 13 L.Ed.2d 125, remarks made by a district attorney asserting that certain judges were lazy, vacation-oriented, and sympathetic to criminals were found to be comments about the judge's official conduct. The Court emphasized that
 [t]he public-official rule protects the paramount public interest in a free flow of information to the people concerning public officials, their servants. To this end, anything which might touch on the official's fitness for office is relevant. Few personal attributes are more germane to fitness for office than dishonesty, malfeasance, or improper motivation, even though these characteristics may also affect the official's private character.
Id. at 77, 85 S.Ct. at 217, 13 L.Ed.2d at 134.
Subsequently, the Court held that "a charge of criminal conduct against an official or candidate, no matter how remote in time or place, is always `relevant to his fitness for office' for purposes of applying the New York Times rule." Ocala Star-Banner Co. v. Damron (1971), 401 U.S. 295,300, 91 S.Ct. 628, 632, 28 L.Ed.2d 57, 62 (discussing Monitor Patriot v. Roy (1971), 401 U.S. 265, 91 S.Ct. 621, 28 L.Ed.2d 35).
We find that, although John Scaccia's position was not an elected one, the responsibilities of his position and the importance of the position in the eyes of the public make him a public official for purposes of the defamation claim. Therefore, he must meet the "actual malice" quantum of proof prescribed in New York Times, supra.
A more difficult question is whether Cynthia Scaccia's marital relationship with a public official, and her involvement in the acts that led to the criminal investigation profiled in the articles, requires her to satisfy the same burden of proof with respect to her own claims for relief.
A person who is alleged to have engaged in criminal conduct is not, per se, a public figure in regard to any alleged defamation arising from the conduct. Wolston v. Reader's Digest Assoc., Inc. (1979), 443 U.S. 157,168, 99 S.Ct. 2708, 61 L.Ed.2d 450, 461. However, the Supreme Court has also noted that "[i]t is preferable to reduce the public-figure question to a more meaningful context by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation." Gertz v. Robert Welch, Inc. (1974), 418 U.S. 323, 352,94 S.Ct. 2997, 3013, 41 L.Ed.2d 789, 812. See also Schiavone Const. Co. v. Time, Inc. (C.A.3, 1988), 847 F.2d 1069. In other words, "[a]lthough the criminal activity may not, by itself, create public figure status, such activity may, nevertheless, be one element in a mix of factors leading to that classification." Marcone v. Penthouse Int'l Magazine for Men (1984), 754 F.2d 1072, 1085. See Schiavone Const. Co. v. Time, Inc. (C.A.3, 1988), 847 F.2d 1069.
Public figure status does not depend on the desires of the individual. Rosanova v. Playboy Enter. (C.A.5, 1978), 580 F.2d 859. A plaintiff may not escape public figure status if he voluntarily engages in a course of conduct that invites attention and comment. Id.
The Gertz Court first recognized that public-figure status may rest on one of two alternative bases: an individual who achieves such fame or notoriety that he is a public-figure for all purposes, or, more commonly, an individual who "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." Id. at 351, 94 S.Ct. at 3013,41 L.Ed.2d at 812. The Court also noted that it may be possible for an individual to become a public figure "through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare." Id. at 345, 94 S.Ct. at 3009, 41 L.Ed.2d at 808. However rare, numerous courts have found individuals to be limited-purpose public figures "through no purposeful action of their own." See Carson v. Allied News Company (C.A.7, 1976), 529 F.2d 206 (Johnny Carson's wife a public figure); Dameron v. Washington Magazine, Inc.(C.A.D.C. 1985), 779 F.2d 736
(Air Traffic Controller on duty at the time of an airplane crash was a limited-purpose public figure); Meeropol v. Nizer (C.A.2, 1977),560 F.2d 1061, 1066 cert. denied, 434 U.S. 1013, 54 L.Ed.2d 756,98 S.Ct. 727 (1978) ("In the course of extensive public debate revolving about the Rosenberg Trial [their children] were cast into the limelight and became public figures under the Gertz standards"); Brewer v. Memphis Pub. Co., Inc. (C.A.5, 1980), 626 F.2d 1238, (husband of a woman who once dated Elvis Presley was a public figure for purposes of an article claiming, incorrectly, that the couple were divorced and that she had reunited with Presley.)
Here, Cynthia Scaccia intentionally ventured to engage in a controversial matter with a public official. Their course of action had a bearing on the public official's fitness for office. She injected herself into a public controversy, and thereby became a public figure for that limited purpose. Furthermore, the fact that Cynthia is married to the public official bolsters her public-figure status. Therefore, Cynthia Scaccia is a public figure for purposes of her defamation claim arising from the articles at issue. Accordingly, because the Scaccias must prove "actual malice," which requires evidence of knowing falsity or reckless disregard for the truth, New York Times, supra, we must now turn to the proof required to meet this high standard.
Proof of actual malice requires an examination of the particular condition of mind[1] of the writers and editors at the point in time when the articles were published. A plaintiff must prove by clear and convincing evidence that the defendant proceeded to publication despite a "high degree of awareness" of the "probable falsity" of the statement, Garrison, supra, 379 U.S. at 74, 85 S.Ct. at 216, 13 L.Ed.2d at 133, or that the "defendant in fact entertained serious doubts as to the truth of his publication." St. Amant v. Thompson (1968), 390 U.S. 727, 731,88 S.Ct. 1323, 1325, 20 L.Ed.2d 262, 267. "Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice." Id.
See also Varanese v. Gall (1988), 35 Ohio St.3d 78.
On the foregoing standards, actual malice is measured at the time the publication takes place. Varanese, supra (citing Dupler v. Mansfield Journal Co., Inc. (1980), 64 Ohio St.2d 116). Accord New York Times, supra, 376 U.S. at 286, 84 S.Ct at 729, 11 L.Ed.2d at 710 ("[t]he statement does not indicate actual malice at the time of the publication. . . .").
After their contacts with Brannon, and before the stories were published, the Defendants obtained numerous documents from the Montgomery County Prosecutor's Office concerning its investigation of the Scaccias' dealings with their elderly neighbor. The newspaper also obtained a copy of the decision of the Probate Court concerning the matter. It had also obtained, though not without some difficulty, a transcript of the proceedings before the Probate Court prior to DNI's October 26, 1998, publication of the other major article at issue.
A review of these materials reveals that the remarks that Brannon allegedly made to the two reporters were not among the facts and circumstances that the Defendants chose to publish. Rather, their publications were founded on and revealed facts and circumstances learned by the Defendants in their subsequent investigations.
Per Evid.R. 402, all relevant evidence is admissible, unless subject to exclusion by law or the Ohio Rules of Evidence. Evidence Rule 401 states: "`Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."
The Supreme Court of Ohio has defined relevancy as "any matter of fact, the effect, tendency, or design of which, when presented to the mind, is to produce a persuasion concerning the existence of some other matter of fact — a persuasion either affirmative or disaffirmative of its existence." Barnett v. State (1922), 104 Ohio St. 298, 306.
 "Of course, the establishment of a connection between the evidence and the fact sought to be proved is not a scientific process. While not expressly indicated on the face of Rule 401, the Rule is applied by the trial judge in a highly discretionary manner."
Weissenberger's Ohio Evidence, Treatise, Section 401.3, at p. 71.
The trial court reasoned that the two reporters' evidence of their contacts with Brannon in late July and early August of 1998 were relevant to whether DNI acted with actual malice when it published the series of articles concerning the Scaccias beginning September 10 of that year. The court cited the reporters' claims that their contacts with Brannon "led them to believe that a story about the Scaccias was one that needed to be pursued," and that "Defendants could use the alleged statements by Brannon to prove they had a solid basis of their articles." The court also reasoned that the Defendants could call Brannon to show that, by reason of his alleged statements, the Defendants "did not publish the articles with knowledge of their falsity or with reckless disregard of the truth" because Brannon's statements "could show that the Defendants had a solid foundation for their story."
Brannon's alleged statements to Modic and Hills were made a month or more before the date the first of their stories were published. Those statements might very well have led the reporters to believe that a story about the Scaccias was one that should be pursued, as the trial court found. However, pursuing the story by investigating it, as Modic and Hills did during the weeks following, is not publishing it, and publication is the basis of a defamation action. Therefore, the reporters' initial reactions or beliefs after speaking with Brannon are not relevant to the issues presented, and their testimony concerning Brannon's alleged statements to them is inadmissible for the first purpose which the court found.
The trial court also found that Brannon's alleged statements are admissible to show that the reporters believed that "they had a solid foundation for their articles," proving that they "did not publish the articles with . . . a reckless disregard of the truth." This purpose focuses on the substance of the publications themselves, and the evidence involved is probative of the particular condition of mind involved in a defamation claim, "actual malice." Therefore, the reporter's testimony concerning Brannon's alleged statements to them is admissible for the second purpose which the trial court found.
We however believe that the order of disqualification was premature because it is not clear at this stage of the proceedings that the testimony of Rob Modic and Wes Hills is clearly relevant to any defense which the defendants may have in this case.
It appears from reading the plaintiffs' lengthy complaint that they believe the Dayton Daily News failed to present a balanced report of the investigation conducted of their receipt of over a half million dollars from an 82 year-old neighbor. Specifically, they allege the newspaper failed to properly emphasize that Mr. H was found to be competent in the probate court proceedings and that Mr. H freely and voluntarily gave them this money in gratitude for their friendship and services.
The trial court has yet to determine whether a number of the causes of action asserted by the Scaccias state a cause of action, e.g., false light, intentional and negligent infliction of emotional stress, "tabloid outrage," tortious interference with expectancy of gifts, and invasion of privacy.
If the defamation consists of the newspapers failing to give a balanced view of the investigation, it is not clear why Modic and Hill's testimony is relevant. Modic stated in his affidavit he and Wes Hills decided "that the story should be strongly pursued based on his conversations with Dwight Brannon." Modic admitted that on September 4, 1998, the Montgomery County Prosecutor's Office released information to the paper which provided "a great deal of detailed information about the case."
Hills stated that Brannon told him that the elderly man had short term memory problems and had signed several checks for thousands of dollars dated the same day to Cynthia Scaccia. These facts, however, are not in dispute and thus Brannon need not refute this evidence.
Modic stated in his affidavit that Brannon told him that John Scaccia believed the probate proceedings were "private" and that a publication of any articles about the investigation would be an "invasion of their privacy."
Some states have recognized the tort of "disclosure of a private fact." That tort occurs when a medium, without consent, disseminates personal information that a reasonable person would find highly offensive and not of legitimate public concern. Thus, newsworthiness is a defense. The fact that the information was taken from a public record of a governmental agency is a defense to an invasion of privacy claim. In Cox Broadcasting Co. v. Cohn (1975), 420 U.S. 469, the United States Supreme Court held that a rape victim's father could not sue for invasion of privacy when WSBT-TV disclosed the name of the victim found in a publicly filed indictment. The Supreme Court concluded that there can be no liability for the accurate reporting of matters taken from public records especially those of the courts. Id. at 496. See also, Florida Star v. B.J.F. (1989), 491 U.S. 524, 534-36.
In this case, the information reported by the Dayton Daily News was contained in either the Montgomery County records or the transcript of the Montgomery County Probate Court. The plaintiffs allege that the three main articles about the investigation occurred on September 20, October 26 and December 19, 1998.
In the September 20, 1998, article titled "man's gift-giving causes concern" the newspaper reported that the Scaccias received more than $500,000 over a four-year span from a wealthy elderly man whose competency was brought in question by the Montgomery County Prosecutor's Office. The paper indicated they obtained this information from a public agency. The paper also reported that Judge Gounaris found that the Scaccias had not exploited Mr. H., but that strict limits would be put on Mr. H's gift giving and Adult Protective Services was to visit him twice a month. Again the newspapers reported information found in public court records.
The October 26, 1998 article quoted at length from the transcript of the probate court competency hearing.
The December 19, 1998 newspaper article was an editorial "opinion" by Hap Capwood in which he opined that Adult Protective Services, a public agency, had played a commendable role in the investigation into Mr. H's gifts to the Scaccias. Long ago, the United States Supreme Court held that defamation requires the publication of a false fact, and opinions are constitutionally protected. Gertz v. Welch (1974), 418 U.S. 323. Justice Lewis Powell noted "there is no such thing as a false idea." Id. at 339. In Milkovich v. Lorain Journal Co. (1990), 497 U.S. 1, 20, the Supreme Court held if the opinion implies a false and defamatory assertion of fact, the opinion is actionable. Ohio has recognized a similar protection for opinions under the Ohio Constitution. Scott v. News-Herald (1986), 25 Ohio St.3d 243. The determination of whether an averred defamatory statement constitutes opinion or fact is a question of law. Scott, supra, at 250.
In short, the trial court has yet to address the many defenses available to the Dayton Daily News under the First Amendment. It may be that Rob Modic and Wes Hills' testimony will bear some possible relevancy to a defense available to the newspaper, but that is not yet clear. We find that the trial court abused its discretion in disqualifying plaintiff's counsel at the early stage of this litigation. Disqualification is, after all, a drastic measure which should not be imposed unless absolutely necessary. Walisjewski v. Caranova Builders, Inc. (1998), 127 Ohio App.3d 429, 433. That necessity has yet to be demonstrated to our satisfaction. We will reverse and remand for further proceedings.
The first assignment of error is sustained.
SECOND ASSIGNMENT OF ERROR
THE LOWER COURT COMMITTED PREJUDICIAL ERROR:
 1) BY NOT ALLOWING DISCOVERY TO DEVELOP AS MANDATED BY THE COURT, WHICH COULD HAVE ELIMINATED ANY POSSIBLE DISQUALIFICATION CLAIMS;
 2) BY ISSUING EX PARTE ORDERS FOR APPELLEES WHICH, IN EFFECT, TERMINATED THE CIVIL LITIGATION PROCESS WITHOUT ANY JUSTIFICATION;
 3) BY ABANDONING THE SCHEDULING ORDER TO THE TOTAL ADVANTAGE OF THE APPELLEES;
 4) BY IGNORING APPELLANTS' PERTINENT MOTIONS, MEMORANDA, EXHIBITS AND EVIDENCE, INCLUDING MOTIONS FOR SANCTIONS WHICH RELATED TO DISQUALIFICATION CLAIMS AND MOOT THEM IF THE PROCESS PROCEEDED AS MANDATED BY THE COURT'S SCHEDULING ORDER.
 THIRD ASSIGNMENT OF ERROR THE TRIAL COURT DENIED APPELLANTS' SUBSTANTIVE AND PROCEDURAL DUE PROCESS WHILE ALLOWING APPELLEES TO PROFIT FROM THEIR OWN WRONG DOING [SIC] BY
 1) ABANDONING THE SCHEDULING ORDER WITHOUT AFFORDING APPELLANTS NOTICE AND OPPORTUNITY TO BE HEARD,
2) DENYING APPELLANTS RIGHTS TO REMEDIES,
 3) ALLOWING APPELLEES TO CONTROL THE LITIGATION PROCESS BY IMPROPER MEANS.
 FOURTH ASSIGNMENT OF ERROR THE SEPARATE AND CUMULATIVE ERRORS BY THE LOWER COURT, INDUCED BY AND PREDICATED UPON THE UNLAWFUL CONDUCT OF APPELLEES, REQUIRES REMAND WITH DECISIONS, ORDERS, INSTRUCTIONS, AND PROCEDURAL REQUIREMENTS TO REMEDY THE HARM DONE TO APPELLANTS, THEIR COUNSEL, AND THE LITIGATION PROCESS.
 FIFTH ASSIGNMENT OF ERROR THE TRIAL COURT'S FAILURE TO ADDRESS APPELLANTS' MOTION TO SEAL THEIR EXHIBIT BOOK BEFORE RULING ON THE MOTION TO DISQUALIFY ALONE OR IN COMBINATION WITH THE MANNER AND TIMING OF THE OTHER ORDERS BY THE COURT RESULTED IN PREJUDICIAL ERROR OF [SIC] APPELLANTS CASE IN VIOLATION OF FUNDAMENTAL NOTIONS OF FAIRNESS AND IMPARTIALITY.
None of the many matters to which Assignments of Error Second through Fifth refer is predicated on a final order as that is defined by R.C.2505.02. Therefore, we lack jurisdiction to review the error assigned, and the assignments of error are overruled.
 Conclusion
The order of the trial court disqualifying Attorney Brannon from representing Plaintiffs-Appellants is Reversed and this cause is Remanded for further proceedings.
YOUNG, J., concurs, GRADY, J., dissenting.
[1] The cases on defamation refer generally to the actor's "state of mind." Civ.R. 9(B) classifies malice as a "condition of the mind."