BLATNIK et al., Appellees,

v.

AVERY DENNISON CORPORATION et al., Appellants.

[Cite as Blatnik v. Avery Dennison Corp., 148 Ohio App.3d 494, 2002-Ohio-1682.]

Court of Appeals of Ohio,
Eleventh District, Lake County.

No. 2000–L–110.

Decided April 12, 2002.

Sindell, Young, Guidubaldi & Sucher, P.L.L., James P. Boyle, Cathleen M. Bolek and Steven A. Sindell, for appellees.

Thompson, Hine & Flory, L.L.P., Daniel R. Warren and Sindy J. Policy, for appellants.

WILLIAM M. O'NEILL, Presiding Judge.

{¶ 1}   Appellants, Avery Dennison Corporation ("Avery Dennison"), David Scheibel ("Scheibel"), and Thomas Loria ("Loria"), appeal the judgment of the Lake County Court of Common Pleas, which entered a favorable verdict on the defamation and loss of consortium claims of appellees, Michael A. and Michelle A. Blatnik ("Mr. and Mrs. Blatnik"), in the amount of $735,000 following a jury trial. For the reasons that follow, the judgment of the trial court is reversed in part as to the loss of consortium claim, but affirmed in all other respects.

{¶ 2}   On February 5, 1999, appellees filed a complaint against Avery Dennison, Scheibel, and Loria, alleging that immediately after Mr. Blatnik was terminated, appellants held a series of meetings with the employees of Avery Dennison. According to the complaint, during these meetings, false and defamatory statements were made to the employees that Mr. Blatnik had been terminated for sexual harassment, and that he had engaged in improper conduct while an employee of Avery Dennison. It was further alleged that these false statements were made with actual malice, and that there was no business reason for the publication of these statements to the employees of Avery Dennison.

{¶ 3}   In addition to Mr. Blatnik's defamation claim, Mrs. Blatnik brought a claim for loss of consortium on the basis that she had been deprived of the services and companionship of her husband as a result of the defamatory statements made by appellants.

{¶ 4}   This matter proceeded to trial where the following facts were adduced. Mr. Blatnik commenced employment with Avery Dennison in 1989. While employed with the company, Mr. Blatnik worked at both the Mentor and Painesville plants. By February 1994, he was the lead process operator in the specialty tape division at the Mentor plant.

{¶ 5}   During this time, Marleah Zacharias ("Zacharias") was hired as a process operator in the specialty tape division where Blatnik was her supervisor and conducted evaluations of her work. Soon after her employment began, Zacharias made claims of sexual harassment against Mr. Blatnik. Then, after only four months of employment, Zacharias resigned in June 1994.

{¶ 6}   In August 1994, Zacharias filed a charge of discrimination with the Ohio Civil Rights Commission ("OCRC") and the Equal Employment Opportunity Commission ("EEOC"), alleging that she was sexually harassed by the lead process operator at Avery Dennison. After conducting an investigation, Avery Dennison prepared a position statement for the OCRC indicating that *"no*

*evidence* exists of a hostile work environment involving behavior or comments of a sexual nature." (Emphasis added.)

{¶ 7} While the OCRC/EEOC found no probable cause with respect to Zacharias's claims, it provided her with a right to sue letter. As a result, in January 1997, Zacharias filed a complaint against Avery Dennison and Mr. Blatnik for, inter alia, sexual harassment. In response, Avery Dennison conducted another investigation into the allegations by deposing Zacharias and interviewing numerous employees. However, the parties ultimately reached a settlement in early 1998. Thereafter, in February 1998, Mr. Blatnik was terminated.

{¶ 8} As a result of his termination, Scheibel, the vice-president and general manager of the specialty tape division, together with Loria, the director of operations, held a series of "communication meetings" with the employees in the specialty tape division at the Mentor and Painesville plants. At these meetings, the following statement was read to the employees:

{¶ 9} *"I have called you together to inform you that Avery Dennison has terminated the employment of Michael Blatnik and to discuss with you the reasons for that decision. Mr. Blatnik's employment with the Company was terminated because we believe that he engaged in abusive behavior towards a female co-worker in 1994 which may be viewed as sexual harassment. This decision was based upon information that came to us through our investigations, both internal and external, through interviews of Avery employees who were present at the time who witnessed certain of the events in question, and through sworn testimony given in litigation which resulted from his misconduct. In the course of that investigation, we obtained evidence that indicated that Mr. Blatnik:*

{¶ 10} *"-repeatedly used abusive and obscene language toward a female employee;*

{¶ 11} *"-interfered with the work of a female employee by refusing to assist her as a member of her team;*

{¶ 12} *"-made an obscene reference to a female employee over a facility public address system;*

{¶ 13} *"-endangered the safety of a female employee who was performing maintenance on machinery by activating the equipment being serviced; and*

{¶ 14} *"-disrupted production by a female employee by altering equipment controls.*

{¶ 15} *"Conduct of this type cannot and will not be tolerated by Avery Dennison and has no place anywhere within the Company.*

{¶ 16} "It is critical that everyone at Avery Dennison understands and supports the Company's policy concerning sexual harassment, discrimination of any kind, and abusive behavior by any Avery Dennison employee. Such conduct is unacceptable to Avery Dennison under any circumstances. Behavior of this type is unlawful and undermines the positive spirit of cooperation and teamwork which is essential to our working environment. Anyone who engages in such behavior is subject to discipline up to and including discharge.

{¶ 17} "It has always been Avery Dennison's policy that:

{¶ 18} "1) every employee is to treat every other employee with respect and dignity, in a professional manner, in the manner with which each of us would like to be treated;

{¶ 19} "2) any employee who has any problem is free and encouraged to raise that problem with anyone at the Company and to pursue that problem until it is resolved;

{¶ 20} "3) every employee has the right to discuss any problem with Avery Dennison Management or Human Resources Personnel in a confidential setting, completely free from any form of retaliation;

{¶ 21} "4) the Company will thoroughly investigate any report of misconduct or unlawful or abusive behavior and take appropriate action based upon the facts determined in that investigation including counseling or disciplinary action up to and including discharge, if necessary.

{¶ 22} "In order for the Company to investigate and rectify instances of improper conduct, it is essential that information be provided to the appropriate persons in a timely manner.

{¶ 23} "-Avery Dennison strongly encourages any person with information concerning such behavior to bring that information to the attention of Avery Dennison management so that this behavior can be investigated in a responsible, timely, and confidential manner.

{¶ 24} "-Every Avery Dennison employee should understand that state and federal law prohibits any employer from taking any retaliatory action against an employee who provides factual information concerning any form of discrimination.

{¶ 25} "-Avery Dennison has always supported and fully supports this vitally important legal principle. Under no circumstances will the Company take or tolerate any form of retaliation against any employee who provides factual information to the Company in the course of an investigation of workplace misconduct. Any employee who feels that he or she has been the victim of retaliation by anyone should immediately report that retaliation to Company

management. All retaliatory conduct will be investigated by the Company and addressed appropriately.

{¶ 26} "-Only through open, candid communication, without fear of retaliation, can all of us at Avery Dennison work together to achieve and maintain a workplace which is free of discriminatory and abusive behavior.

{¶ 27} "-We hope that we can count on each of you to work with us toward that goal." (Emphasis added.)

{¶ 28} While Mr. Blatnik takes issue with the emphasized portion of this statement, Scheibel stated that it was necessary to mention Mr. Blatnik at the meetings and state the reasons for his termination in order for the employees to understand the sexual harassment policy. Further, Scheibel indicated that there was no reason to disbelieve the claims against Mr. Blatnik, and that he did not have any doubt regarding the reliability of the information upon which the statements were based.

{¶ 29} At trial, appellees presented the testimony of several employees of Avery Dennison, including Richard Pohl, Patricia Lee Naumann, Peggy Fulmer, Mark R. Rago, William Wood, and Mike Webster. Generally, these employees stated that they *never* observed Mr. Blatnik sexually harass Zacharias. Mr. and Mrs. Blatnik also testified on their own behalf.

{¶ 30} In turn, appellants offered the testimony of the following Avery Dennison employees: Edward F. Kloc ("Kloc"), Paul Phipps, Keith Lipovich, and Paul Durda. Generally speaking, these witnesses stated that Mr. Blatnik used abusive and derogatory sexual language towards Zacharias and explained that she complained to them about Mr. Blatnik sexually harassing her.

{¶ 31} For instance, Kloc testified that he observed the following incidents between Mr. Blatnik and Zacharias:

{¶ 32} "A. * * * Mr. Blatnik asked if I would take these gloves down to her [Ms. Zacharias] and when I got down to her station he got on the microphone and he asked me in front of her, she heard it, I tried, if I was going to try to get into that red bush while I was down there giving her the gloves, Ms. Zacharias got quite upset and started crying and apologized for me being involved in this conversation, I told her not to worry about it. * * *

{¶ 33} "Q. Mr. Kloc, can you describe any other actions that you observed between Michael Blatnik and Marleah Zacharias?

{¶ 34} "A. One night the machine was running quite well and when the machine is running well and things are going smooth you get in conversations, you have a little bit of conversation and one night I was standing there with Mr. Blatnik and Ms. Zacharias and Patty, at that time it was Patty Balog and we're

standing there talking and he looked over at Ms. Zacharias and asked her when is the last time she got screwed and to me, I'm sorry, it's not appropriate."

{¶ 35}  Additionally, appellants introduced Zacharias as a witness by reading portions of her deposition testimony to the jury.  In her deposition testimony, Zacharias indicated that she was sexually harassed by Mr. Blatnik.

{¶ 36}  After a three-day trial on this matter, the jury returned a verdict in favor of appellees and awarded $735,000 in damages, to wit, $100,000 in compensatory damages awarded to Mr. Blatnik on his defamation claim;  $135,000 awarded to Mrs. Blatnik on her loss of consortium claim;  and $500,000 in punitive damages.

{¶ 37}  In response to the jury verdict, appellants filed a motion for a new trial, or, in the alternative, remittitur, along with a motion for judgment notwithstanding the verdict.  Upon consideration, the trial court denied these motions in a judgment entry dated June 7, 2000.

{¶ 38}  From this judgment, appellants appeal, advancing four assignments of error for our consideration:

{¶ 39}  "[1.]  The trial court erred in overruling Avery Dennison's motion for summary judgment, motions for directed verdict, and motion for judgment notwithstanding the verdict on the defamation claim.

{¶ 40}  "[2.]  The trial court erred in permitting the jury to award punitive damages against Avery Dennison, and in denying the motions for judgment notwithstanding the verdict and new trial with regard to punitive damages.

{¶ 41}  "[3.]  The trial court erred in excluding Zacharias's diary.

{¶ 42}  "[4.]  The trial court erred in overruling Avery Dennison's motion for a directed verdict and motion for judgment notwithstanding the verdict on the loss of consortium claim."

{¶ 43}  In the first assignment of error, appellants challenge the trial court's denial of the following:  (1) motion for leave to file summary judgment instanter; (2) motion for directed verdict;  (3) motion for judgment notwithstanding the verdict;  and (4) motion for new trial.  As such, we will address each in turn.

{¶ 44}  With respect to the September 29, 1999 motion for leave to file summary judgment instanter, the parties seemingly concede to the fact that at the time the motion was filed, a pretrial conference and trial date were already set in this matter; October 15, 1999, and December 6, 1999, respectively.  In such

instances, "a motion for summary judgment may be made only with leave of court."[1]

{¶ 45} In reviewing this instant cause, we are mindful of the fact that the decision to grant a motion for leave to file summary judgment is within the sound discretion of the trial court.[2] As such, we will not reverse the trial court's decision denying appellants' motion for leave unless we determine that the trial court's decision was unreasonable, arbitrary, or unconscionable and not merely an error of law or judgment.[3] We are further aware of the fact that an abuse of discretion cannot be found simply because a reviewing court would have decided the case differently.[4]

{¶ 46} Upon consideration, we determine that the trial court was within its discretion to deny appellants' motion for leave to file summary judgment because a pretrial conference was scheduled and the matter was set for trial. We are, nevertheless, cognizant of the fact that the trial court seemed to address the merits of appellants' motion for summary judgment in its October 5, 1999 judgment entry:

{¶ 47} "Upon review, the Court finds that although qualified privilege exists for some communications, *outstanding issues of fact remain to be determined;* therefore, said Motion is not well taken and ought to be denied." (Emphasis added.)

{¶ 48} However, to consider the merits of the motion, the trial court must have first granted leave, which it refused to do in this case. Therefore, the fact that the trial court commented on the merits of appellants' motion for summary judgment is of no consequence. Accordingly, we discern no abuse of discretion.

{¶ 49} The second and third issues presented under the first assignment of error challenge the trial court's denial of appellants' motions for directed verdict and judgment notwithstanding the verdict. Generally, according to appellants, appellees failed to present clear and convincing evidence of actual malice to defeat the qualified privilege.

{¶ 50} Because the standard for granting these motions is identical, we will consider these issues in a consolidated manner.

---

1. Civ.R. 56(B).

2. *Slack v. Cropper* (2001), 143 Ohio App.3d 74, 83, 757 N.E.2d 404.

3. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140.

4. *Hutchinson v. Hutchinson* (1993), 85 Ohio App.3d 173, 178, 619 N.E.2d 466.

{¶ 51} At the outset, we note that our review of the trial court's ruling on motions for directed verdict and judgment notwithstanding the verdict is de novo.[5] Further, it has been recognized that "[a] motion for directed verdict or a motion for judgment notwithstanding the verdict does not present factual issues, but a question of law, even though in deciding such a motion, it is necessary to review and consider the evidence."[6]

{¶ 52} In *Allen v. Znidarsic Bros., Inc.*, this court articulated the standard for considering motions for a directed verdict and judgment notwithstanding the verdict:

{¶ 53} *"In deciding whether to grant a motion for a directed verdict or a judgment notwithstanding the verdict, a trial court must construe all of the evidence most strongly in favor of the party against whom the motion was made, and, where there is substantial evidence to support its side of the case, upon which reasonable minds may reach a different conclusion, the motion must be denied. Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination in ruling upon either of the above motions. Posin v. A.B.C. Motor Court Hotel* (1976), 45 Ohio St.2d 271, 275 [74 O.O.2d 427, 344 N.E.2d 334]."[7] (Emphasis added.)

{¶ 54} As for appellants' fourth issue concerning the denial of their motion for a new trial, they urge that the judgment was contrary to law and not supported by the weight of the evidence.

{¶ 55} It is within the trial court's sound discretion to grant or deny a Civ.R. 59(A) motion for a new trial. As such, an appellate court will not reverse the trial court's determination absent an abuse of discretion.[8]

{¶ 56} With the foregoing standards in mind, we conclude that the trial court did not err in denying appellants' motions for a directed verdict and judgment notwithstanding the verdict, because reasonable minds could reach a different conclusion on the issue of whether there was substantial evidence that appellants acted with actual malice. Further, we determine that appellants are

5. *Krannitz v. Harris* (Jan. 19, 2001), Pike App. No. 00CA649, 2001 WL 243388, at * 3; *Davis v. Safe Auto Ins. Co.* (Mar. 31, 2000), Ashtabula App. No. 98–A–0103, 2000 WL 522495, at * 4.

6. *O'Day v. Webb* (1972), 29 Ohio St.2d 215, 58 O.O.2d 424, 280 N.E.2d 896, paragraph three of the syllabus.

7. *Allen v. Znidarsic Bros., Inc.* (Dec. 29, 2000), Lake App. No. 99–L–088, 2001 WL 20726, at * 3.

8. *Kitchen v. Wickliffe Country Place* (July 13, 2001), Lake App. No. 2000–L–051, 2001 WL 799750.

not entitled to a new trial, because the verdict is not contrary to law or against the manifest weight of the evidence.

{¶ 57} In the instant matter, the trial court found that the statements made by appellants during the communication meetings with the specialty tape division employees were defamatory per se. Despite this determination, appellants invoked the defense of qualified privilege. Under the qualified privilege doctrine, a defamation action is barred when the communication is made in good faith on a matter of common interest between an employer and an employee concerning the conduct of a former employee.[9]

{¶ 58} In the present cause, the trial court appropriately determined that the defense of qualified privilege applied as a matter of law. "Where the circumstances of the occasion for the alleged defamatory communications are not in dispute, the determination of whether the occasion gives the privilege is a question of law for the court."[10]   (Citation omitted.)

{¶ 59} Here, there is no dispute as to the circumstances under which the defamatory statements were made or the contents of those statements. The communications were made during several meetings with Mr. Blatnik's immediate co-workers, wherein the corporation stated that Mr. Blatnik was terminated for sexual harassment and explained its sexual harassment policy. According to Taras Szmagala, the purpose of conducting the meetings was to prevent rumors from developing and ensure that the employees clearly understood the company's sexual harassment policy. Similarly, Scheibel testified that the meetings were held "to let folks know that we had—we had terminated [Mr. Blatnik] and to—to suggest that Avery does not tolerate the kind of environment that had been created by [Mr. Blatnik]." Therefore, under these particular circumstances, the determination of the existence of qualified privilege was a question of law for the trial court.[11]

{¶ 60} To defeat the qualified privilege, appellees had to show, *by clear and convincing evidence*, that appellants' communications were made with

---

9.   *A & B–Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council* (1995), 73 Ohio St.3d 1, 8, 651 N.E.2d 1283; *Hahn v. Kotten* (1975), 43 Ohio St.2d 237, 244–246, 72 O.O.2d 134, 331 N.E.2d 713; *Hanly v. Riverside Methodist Hosp.* (1991), 78 Ohio App.3d 73, 81, 603 N.E.2d 1126; *Gray v. Gen. Motors Corp.* (1977), 52 Ohio App.2d 348, 351, 6 O.O.3d 396, 370 N.E.2d 747.

10.   *A & B–Abell* at 7, 651 N.E.2d 1283.

11.   See, e.g., *Hanly* at 81, 603 N.E.2d 1126 (holding that a hospital had a qualified privilege to make allegedly defamatory statements about employees suspended pending a sexual harassment investigation where the communication was made in an employment setting concerning a matter of common hospital interest, to wit, the sexual harassment policy).

actual malice.[12]   In order to prove actual malice, appellees had to demonstrate that the published statements were made with knowledge of their falsity or with reckless disregard as to their truth or falsity.[13]   "This standard carries the requirement that we conduct an independent review of the sufficiency of the evidence."[14]   Reckless disregard may be established by clear and convincing evidence that the false statements were made with a " '*high degree of awareness of* * * * *probable falsity,*' * * * or that 'the defendant in fact entertained *serious doubts* as to the truth of his publication.'   * * *"[15]   (Citations omitted and emphasis added.)

{¶ 61}   Further, in *Varanese*, the Supreme Court of Ohio had the opportunity to comment on the reckless disregard standard of actual malice:

{¶ 62}   "The United States Supreme Court has emphasized that 'reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing.   There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.   Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.'   *St. Amant [v. Thompson]*, supra, [(1968), 390 U.S. 727] at 731 [88 S.Ct. 1323, 20 L.Ed.2d 262].   The plaintiff must prove the defendant's actual knowledge or reckless disregard for the truth with convincing clarity in order to warrant submission of the cause to the jury.   *Grau [v. Kleinschmidt]*, supra [(1987)], 31 Ohio St.3d [84] at 89 [31 OBR 250, 509 N.E.2d 399].   Finally, actual malice is to be measured as of the time of publication.   *Dupler [v. Mansfield Journal Co., Inc.]*, supra [(1980)], 64 Ohio St.2d [116] at 124 [18 O.O.3d 354, 413 N.E.2d 1187]."[16]   (Emphasis added.)

{¶ 63}   With these principles in mind, we turn now to a consideration of whether appellants were entitled to a directed verdict, judgment notwithstanding the verdict, or a new trial.

{¶ 64}   This case presents a dilemma for anyone trying to find the truth. Zacharias claims that she was sexually harassed on the job in a most egregious

---

12.   *Jacobs v. Frank* (1991), 60 Ohio St.3d 111, 573 N.E.2d 609, paragraph two of the syllabus; *Vitale v. Modern Tool & Die Co.* (June 22, 2000), Cuyahoga App. No. 76247, 2000 WL 804617, at * 4.

13.   *Jacobs* at paragraph two of the syllabus; *Vitale* at * 4.

14.   *A & B–Abell* at 12, citing *Jacobs* at 116, 573 N.E.2d 609.

15.   *Varanese v. Gall* (1988), 35 Ohio St.3d 78, 80, 518 N.E.2d 1177.

16.   *Varanese* at 80, 518 N.E.2d 1177.

fashion. Possibly the most damaging testimony in this matter was the allegation that Mr. Blatnik got on the public address system and made sexually suggestive comments about Zacharias. Such conduct, if it occurred, is clearly actionable. Thus, it was not surprising that Zacharias filed a complaint with the OCRC.

{¶ 65} From a legal standpoint, however, what happened next is significant. Avery Dennison issued a position statement to the OCRC claiming that "[Zacharias] never did complain to management about being sexually harassed" and that "[she] did not communicate her concerns with sexual harassment to anyone who was in a position to respond to those concerns." From this, the company, through its representatives, concluded that "[t]he harassment of which Marleah complains is not due to her gender and *no evidence exists of a hostile work environment involving behavior or comments of a sexual nature.*" (Emphasis added.) Thus, the truth, as defined by appellants, was that *no sexual harassment had taken place.*

{¶ 66} Truth is not situational. Something is either true or false. That designation will not change with circumstances which benefit or harm individuals. Thus, for the purposes of this litigation, as of the time that Avery Dennison was responding to the OCRC, the truth of the matter was that Mr. Blatnik had not sexually harassed Zacharias. This version of the truth was further supported at trial when numerous employees testified under oath that they never observed such conduct.

{¶ 67} Sexual harassment in the workplace is serious business. If it happened, then it must be dealt with in a professional manner. Such vigilance, however, carries with it significant perils. One who is rightfully or wrongfully accused of such activities can essentially say good-bye to one's career. In either event, they have become damaged goods in the workplace. That is precisely why the law is clear, that if you show reckless disregard for the truth, you are liable to the person harmed by your reckless conduct.

{¶ 68} In responding to a motion for a directed verdict or judgment notwithstanding the verdict, the nonmoving party is entitled to have all the evidence construed in his or her favor.[17] The motion shall be denied unless reasonable minds can reach one conclusion.[18] That simply is not the case in this matter. Placing all the inferences on the side of the nonmoving party, in this case appellees, this court can only reach the same conclusion reached by the trial court. The question is narrow and easily resolved: if an employer admits on one day that there was no sexual harassment at its plant, and on another day that

17. *Allen* at * 3.

18. Id.

there was, has it shown a reckless disregard for the truth? By demonstrating this seemingly inconsistent behavior under oath, have appellees presented enough evidence to survive a directed verdict, judgment notwithstanding the verdict, or a motion for a new trial? The answer is in the affirmative. The jury could have concluded that appellants acted with actual malice from the fact that they previously admitted to the OCRC that there was *no evidence* that Mr. Blatnik sexually harassed Zacharias, and that such knowledge may have existed at the time appellants made the communications at issue.

{¶ 69} A jury was duly impaneled in this matter to answer whether appellants' conduct rose to the level of actual malice. Few among us would question the proposition that falsely labeling an individual as one who is guilty of sexual harassment in the workplace would be anything other than harmful to future employment prospects. On the other side of that same coin, however, few would argue with the right of a company to publicly condemn sexual harassment by an employee. That is specifically why a qualified privilege exists. A company must have the freedom to manage its workforce, and sometimes that requires making truthful, but unpleasant, remarks. However, in order to enjoy the freedom of expression granted by the privilege, the law requires that the communication be made with careful regard to the truth. This lawsuit is not only about whether the statements were true, but also about whether appellants were reckless in evaluating their veracity.

{¶ 70} This panel is not the first group of individuals to be troubled by the task at hand. During their deliberations, the jury asked the trial judge, in writing, first, "[w]hat is the definition of the 'qualified privilege'" and then to "[d]efine reckless disregard * * *." The judge properly instructed the jury, in writing, that "[y]ou may find that publication of a defamatory statement is made with actual malice only if you find, by clear and convincing evidence, that [appellants] published the statements either with actual knowledge that the statements were false or with a reckless disregard as to their truth or falsity." Thus, the trial court clearly told the jury the legal standard in Ohio, as dictated by the Supreme Court of Ohio in *Jacobs,* supra.

{¶ 71} There is no question that the jury found that the statements of appellants were made with reckless disregard to their truth. Once a bell has rung, you cannot un-ring it. A man's reputation is ruined when he is publicly labeled as one who cannot be trusted around women in the workplace. If the label is accurate, so be it. But if it is not, then damages will naturally flow from the defamatory statements. Only a jury can decide these matters with certainty. And, as stated by the trial court in its judgment entry denying appellants' motion for a new trial, "[this] jury concluded that [appellees] proved, by clear and

convincing evidence, that [appellants'] defamatory remarks were made in conscious or reckless disregard for the truth."

{¶ 72} It is wholly improper for this court to overturn a verdict which has been reached by a jury after they have been properly instructed in the law of Ohio. The Supreme Court of Ohio has established the standard to be met. The trial court applied that standard, and it was within the province of the jury to decide which version of the facts to believe. Accordingly, appellants' first assignment of error is meritless, and the verdict stands.

{¶ 73} In assignment of error two, appellants maintain that the trial court erred in denying their motions for judgment notwithstanding the verdict and new trial with respect to the award of punitive damages for two reasons. First, appellants claim that the award will deter desirable behavior; second, the record contains no evidence that appellants' acted with actual malice to support a punitive damages award.

{¶ 74} However, as can be seen from our discussion of the first assignment of error, we conclude that the jury could reasonably have found that appellants consciously disregarded Mr. Blatnik's right not to be subjected to defamatory statements or have his reputation injured.

{¶ 75} In *Moskovitz v. Mt. Sinai Med. Ctr.*, the Supreme Court of Ohio defined actual malice needed to assess punitive damages:

{¶ 76} " 'Actual malice, necessary for an award of punitive damages, is (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, *or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.*' "[19] (Emphasis added.)

{¶ 77} An appellate court will not reverse an award of punitive damages "unless it is based upon passion and prejudice."[20]

{¶ 78} While appellants may have been motivated by their need to further its sexual harassment policy, there was evidence to indicate that they consciously refused to recognize the truth. This could be inferred from appellants' early admission to the OCRC that no evidence of sexual harassment existed but now claim otherwise. As such, the jury could have concluded from this evidence that (1) appellants consciously disregarded the rights and safety of Mr.

---

19. *Moskovitz v. Mt. Sinai Med. Ctr.* (1994), 69 Ohio St.3d 638, 652, 635 N.E.2d 331.

20. *Okocha v. Fehrenbacher* (1995), 101 Ohio App.3d 309, 324, 655 N.E.2d 744. See, also, *West Channel Yacht Club v. Turner* (Dec. 3, 1999), Lake App. No. 98–L–156, 1999 WL 1313694, at * 5.

Blatnik to be free from defamatory statements and (2) that appellants' conduct had a great probability of causing substantial harm, to-wit, damaging Mr. Blatnik's reputation.

{¶ 79} Furthermore, before the jury concluded their deliberations, they once again asked the trial court for guidance in the law, when they asked, "[w]hat is the definition of punitive damages?" The court properly responded, in writing, that "[p]unitive damages are an additional punishment beyond general damages for a wrongful act and it tells the community and those perpetrating wrongful acts that such wrongs will not be tolerated." That is the law of Ohio.

{¶ 80} Accordingly, we hold the trial court did not err in denying appellants' motions for judgment notwithstanding the verdict or new trial. Nor was the award of $500,000 in punitive damages manifestly excessive in light of the facts of the instant case. The second assignment of error is, therefore, without merit.

{¶ 81} In the third assignment of error, appellants submit that the trial court erred when it excluded Zacharias's personal diary on the basis of hearsay.

{¶ 82} It is within the trial court's discretion to admit or exclude evidence. As such, the trial court's determination will not be disturbed on appeal absent an abuse of discretion.[21]

{¶ 83} Contrary to appellants' assertion, Zacharias's diary contains out-of-court statements that were offered by appellants to prove the truth of the matters asserted therein. Accordingly, Zacharias's diary and the entries made therein constitute hearsay. Pursuant to Evid.R. 802, hearsay evidence is inadmissible unless some exception applies to permit its introduction.

{¶ 84} Appellants claim that the testimony fell into the Evid.R. 803(3) exception to the hearsay rule in that it shows Scheibel's state of mind with respect to forming his belief that Mr. Blatnik sexually harassed Zacharias. Evid.R. 803(3) reads as follows:

{¶ 85} "The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

{¶ 86} " * * *

{¶ 87} "(3) Then existing, mental, emotional, or physical condition. *A statement of the declarant's then existing state of mind,* emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact

---

21. *Sines & Sons, Inc. v. Shell Oil Co.* (Sept. 18, 1998), Geauga App. No. 96–G–2040, 1998 WL 683938, at * 2.

remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will." (Emphasis added.)

{¶ 88} The diary is inadmissible under Evid.R. 803(3) for the following reasons. Even if Scheibel relied on the diary during his investigation, the *declarant* of the diary is Zacharias, and it does *not* show Scheibel's then existing state of mind with respect to his decision-making process. Therefore, the diary was inadmissible under Evid.R. 803(3).

{¶ 89} Appellants also claim that the diary fell into the prior consistent statement exception. According to them, at trial, Zacharias's credibility was attacked; therefore, the diary should have been admitted for rehabilitation purposes.

{¶ 90} Pursuant to Evid.R. 801(D)(1)(b) a declarant's prior consistent statement is not hearsay if (1) *the declarant testifies at trial and is subject to cross-examination concerning the statement;* (2) the statement is consistent with his/her prior testimony, and (3) it is offered to rebut an express or implied charge of recent fabrication.

{¶ 91} In the instant matter, Zacharias was *not* available for cross-examination at trial concerning her alleged prior consistent statements. In fact, she *never* testified at trial; rather, her deposition testimony was admitted. As such, the diary was inadmissible under Evid.R. 801(D)(1)(b).[22] Accordingly, the trial court did not abuse its discretion when it excluded Zacharias's diary, and appellants' third assignment of error is not well taken.

{¶ 92} The fourth assignment of error challenges the trial court's decision to deny appellants' motions for directed verdict, judgment notwithstanding the verdict, and new trial as to Mrs. Blatnik's claim for loss of consortium. Initially, appellants submit that the claim fails because there is no evidence of bodily injury suffered by Mr. Blatnik. To support its position, appellants rely on this court's decision in *Morgan v. Enterprise Rent–A–Car.*[23]

{¶ 93} In *Morgan,* the jury awarded the wife-plaintiff $5,000 on her loss of consortium claim. On appeal, defendants argued that "a loss of consortium claim is dependant upon bodily injury to the spouse, and that bodily injury does not include emotional distress."[24] From this, defendants concluded that since the

---

**22.** See, e.g., *State v. Brown* (1981), 3 Ohio App.3d 131, 138, 3 OBR 148, 443 N.E.2d 1382; *State v. Weicht* (May 25, 1993), Franklin App. No. 92AP–1776, 1993 WL 186648, at * 4.

**23.** *Morgan v. Enterprise Rent–A–Car* (Mar. 31, 2000), Trumbull App. No. 98–T–0103, 2000 WL 523085.

**24.** *Morgan* at * 6.

husband suffered only emotional distress, the wife was not entitled to damages for loss of consortium.

{¶ 94}  Upon consideration, we found defendants' argument to be persuasive:

{¶ 95}  "Appellants are correct in their assertion that a claim for loss of consortium is dependent upon bodily injury to the spouse.  *Bowen v. Kil–Kare, Inc.* (1992), 63 Ohio St.3d 84, 93, 585 N.E.2d 384.  The key question is whether the term 'bodily injury' includes non-physical harms such as emotional distress. Ohio courts, including this one, have repeatedly held that it does not.  *Tomlinson v. Skolnik* (1989), 44 Ohio St.3d 11, 14, 540 N.E.2d 716; *Bowman v. Holcomb* (1992), 83 Ohio App.3d 216, 219, 614 N.E.2d 838; *Vance v. Sang Chong, Inc.* (Nov. 9, 1990), Lake App. No. 88–L–13–188, unreported, at 3 [1990 WL 174121]."[25]  (Emphasis added.)

{¶ 96}  Contrary to appellants' assertion, the above proposition of law existed prior to this court's decision in *Morgan.*[26]  Nevertheless, appellants failed to present the lack-of-bodily-injury argument to the trial court in its motions for directed verdict, judgment notwithstanding the verdict, or new trial.  As such, this court will not consider an error which the party could have raised, but did not, in the trial court at a time when such error could have been avoided or corrected by the trial court.[27]  Thus, absent plain error, appellants have waived this argument concerning the lack of bodily injury for purposes of appeal.[28]

{¶ 97}  Further, not only did appellants fail to bring the lack-of-bodily-injury argument to the attention of the trial court, they filed the following proposed jury instruction:

{¶ 98}  "Michelle Blatnik's Consortium Claim:  If you find that [appellants are] liable for defaming Michael Blatnik, you may award an amount that will reasonably compensate Michael Blatnik's wife, Michelle Blatnik, for damages which you find resulted from a loss of consortium.  Consortium includes services, society, companionship, comfort, sexual relations, love, and solace."

{¶ 99}  In fact, the trial court provided the above instruction *practically verbatim* to the jury, and appellants did not object:

---

25.  *Morgan* at * 6. See, also, *Black v. Columbus Pub. Schools* (S.D.Ohio 2000), 124 F.Supp.2d 550, 589–590.

26.  See *Bowen v. Kil–Kare, Inc.,* 63 Ohio St.3d at 93, 585 N.E.2d 384.

27.  *Nozik v. Kanaga* (Dec. 1, 2000), Lake App. No. 99–L–193, 2000 WL 1774136, at * 2; *O'Brikis v. O'Brikis* (Oct. 6, 2000), Portage App. No. 99–P–0045, 2000 WL 1488041, at * 3.

28.  *Goldfuss v. Davidson* (1997), 79 Ohio St.3d 116, 121–122, 679 N.E.2d 1099 (holding that while the plain error doctrine is applicable to civil cases, it is limited to extremely rare cases involving exceptional circumstances).

{¶ 100} "[I]f you find [appellants] are liable for defaming Michael Blatnik you may award an amount that will reasonably compensate Michael Blatnik's wife, that is Michelle Blatnik, for damages which you find resulted from a loss of consortium.

{¶ 101} "Consortium includes services, society, companionship, comfort, conjugal relations, love and solace."

{¶ 102} While generally, this court will not apply the plain error doctrine because appellants seemingly invited the error to occur,[29] exceptional circumstances exist in this particular case. We believe that the judicial system would be undermined if this court were to uphold the jury's award of $135,000 for Mrs. Blatnik's loss of consortium claim in the absence of any evidence indicating that Mr. Blatnik suffered bodily injury.

{¶ 103} Accordingly, as a matter of law, the claim for loss of consortium in this case cannot stand because there is no evidence of bodily injury sustained by Mr. Blantik. For this same reason, the award is also against the manifest weight of the evidence.

{¶ 104} As to this point, appellees claim that the proposition of law announced in *Morgan*, supra, is unconstitutional because it violates the provisions of the open courts, right to remedy by due process, the equal protection provision, and the right to a jury trial. We find appellees' claims to be unpersuasive.

{¶ 105} Contrary to appellees' contention, the Supreme Court of Ohio has, indeed, limited claims for loss of consortium to instances where the spouse has suffered bodily injury:

{¶ 106} "* * * [A] claim for loss of consortium is derivative in that the claim is dependent upon the defendant's having committed a legally cognizable tort *upon the spouse who suffers bodily injury.*"[30] (Emphasis added.)

{¶ 107} As such, this court is unwilling to hold that the above statement of law as dictated by the Supreme Court is unconstitutional. Accordingly, appellants' fourth assignment of error has merit to the extent indicated. Appellants also submit that Mrs. Blatnik's loss of consortium claim fails because there was no evidence offered regarding the marital relationship after Avery Dennison terminated Mr. Blatnik and made the communications at issue. This argument, however, is moot in light of our initial disposition of the fourth assignment of error.

---

29. *Czup v. Czup* (Sept. 17, 1999), Ashtabula App. No. 98–A–0046, 1999 WL 744034, at * 7.

30. *Bowen* at 93, 585 N.E.2d 384.

{¶ 108}  Based on the foregoing analysis, the judgment of the trial court is reversed as to the loss of consortium claim, but affirmed in all other respects. Accordingly, the judgment in favor of appellees is reduced by $135,000.

Judgment accordingly.

NADER, J., concurs.

CHRISTLEY, J., dissents.

CHRISTLEY, Judge, dissenting.

{¶ 109}  I respectfully dissent from that portion of the majority opinion concerning the issues of actual malice and punitive damages.

{¶ 110}  While I generally agree with the case law cited by the majority, I would note that this case involves the reporting of a third party's allegations, to wit, Zacharias.  When hearsay allegations are involved, "recklessness may be found where there are *obvious reasons to doubt the veracity of the informant or the accuracy of his [or her] reports.*"  (Emphasis added.)  *St. Amant v. Thompson* (1968), 390 U.S. 727, 732, 88 S.Ct. 1323, 20 L.Ed.2d 262.

{¶ 111}  In their answer brief, appellees insist that the testimony of Scheibel, the vice-president and general manager of the specialty tape division, provided clear and convincing evidence that appellants had doubts about the truthfulness of Zacharias's claims against Mr. Blatnik.  However, a close review of Scheibel's testimony reveals otherwise.

{¶ 112}  During the trial, Scheibel, along with Szmagala, division counsel for Avery Dennison, repeatedly stated that he believed that the company's statements made at the 1998 communication meetings were true.  Moreover, Scheibel and Szmagala *never* stated that, *at the time the company statements were made,* they entertained *serious doubts* as to the truth of the published statements.

{¶ 113}  Rather, Scheibel explained that the veracity of the claims against Mr. Blatnik arguably might have been questioned initially because a number of interviewed coworkers had stated they did not personally observe Mr. Blatnik sexually harass Zacharias.  He further stated that two coworkers considered Zacharias to be a liar.  Out of context, the failure to consider such facts might be enough to prove that appellants acted with actual malice.  In context, it was readily apparent that those facts were only part of the total body of evidence available to Scheibel at the time the statements were finally made by the company.

{¶ 114}  Hence, Scheibel admittedly may have had concerns in the beginning days of the investigation.  However, some early doubts as to the *possible* falsity of the claims against Mr. Blatnik were insufficient to meet the standard of clear and convincing evidence.  *Varanese v. Gall* (1988), 35 Ohio St.3d 78, 82, 518

N.E.2d 1177. Rather, the focus of the jury's evaluation should have been whether, *at the time of the published statements, appellants had a high degree of awareness of the probable falsity of the published statements.* Id. at 80, 518 N.E.2d 1177.

{¶ 115} Appellees, along with the majority, make much of the fact that Avery Dennison reversed its position as to whether Mr. Blatnik sexually harassed Zacharias. In 1994, Avery Dennison initially told the OCRC that it found "no evidence * * * involving behavior or comments of a sexual nature" directed at Zacharias. From this, the majority concludes that actual malice in the company's later actions exists:

{¶ 116} *"The question is narrow and easily resolved: if an employer admits on one day that there was no sexual harassment at its plant, and on another day that there was, has it shown a reckless disregard for the truth?* By demonstrating this seemingly inconsistent behavior under oath, have appellees presented enough evidence to survive a directed verdict, judgment notwithstanding the verdict, or a motion for a new trial? The answer is in the affirmative. *The jury could have concluded that appellants acted with actual malice from the fact that they previously admitted to the OCRC that there was no evidence that Mr. Blatnik sexually harassed Zacharias, and that such knowledge may have existed at the time appellants made the communications at issue."* (Emphasis added.) ¶ 68, supra.

{¶ 117} With all due respect to the majority, I simply disagree. The record definitively shows that there were actually two investigations undertaken by the company. The first investigation was conducted in response to the OCRC action. However, the bulk of the employee interviews, including Zacharias's deposition, were not taken until *after* Zacharias brought suit against Avery Dennison in January 1997.

{¶ 118} At most, appellants may have acted *negligently* when they issued their position statement to the OCRC indicating that they found no evidence of sexual harassment. The conclusion to be drawn from that initial statement was simply that appellants failed to thoroughly investigate Zacharias's OCRC allegations. The fact that Avery Dennison subsequently did a better job of investigating and, as a result, changed its position and conclusion, does *not*, in any way, rise to the level of actual malice as the majority suggests. See *Scott v. News–Herald* (1986), 25 Ohio St.3d 243, 248, 25 OBR 302, 496 N.E.2d 699, quoting *Dupler v. Mansfield Journal* (1980), 64 Ohio St.2d 116, 119, 18 O.O.3d 354, 413 N.E.2d 1187 (holding that " '[s]ince reckless disregard is not measured by lack of reasonable belief or of ordinary care, even evidence of negligence in failing to investigate the facts is insufficient to establish actual malice' "). See, also, *Harte–Hanks Comm., Inc. v. Connaughton* (1989), 491 U.S. 657, 688, 109 S.Ct. 2678, 105 L.Ed.2d 562;

*Kassouf v. Cleveland Magazine City Magazines, Inc.* (2001), 142 Ohio App.3d 413, 423, 755 N.E.2d 976 (holding that "[e]ven evidence of negligence in failing to investigate the facts is insufficient to establish actual malice").

{¶ 119}  The evidence was uncontroverted that, in 1997 after Zacharias filed her suit against Avery Dennison, and prior to publishing the statements made at the 1998 communication meetings, Avery Dennison consulted its legal counsel, conducted numerous additional employee interviews, and deposed Zacharias.  At the completion of its investigation, Avery Dennison was aware there were conflicting stories and that the majority of employees did not observe any sexual harassment.  Nevertheless, a few employees stated that Mr. Blatnik used abusive and derogatory sexual language towards Zacharias and that she had confided in them that Mr. Blatnik was sexually harassing her.  In fact, Szmagala acknowledged this on cross-examination:

{¶ 120}  *"A.   \* \* \* I weighed the credibility of individuals and the testimony* [interviews conducted with Avery Dennison employees], *you know, you have to make a judgment call, I mean the fact is that someone's not telling the truth and so you really have to use your best judgment to determine what happened and that's what I did.*                                                                     .

{¶ 121}  *"Q.   And you testified that in using your best judgment I think you say everything, you said three or four times you had no doubt whatsoever, no doubt as to the truthfulness of all of her [Ms. Zacharias's] allegations with the exception of these two you mentioned;  is that correct?*

{¶ 122}  *"A.   That's correct.*

{¶ 123}  *"Q.   So that all of these different individuals who said they saw nothing who worked in the same place who testified the way they did or gave statements the way they did—*

{¶ 124}  *"A.   Well—*

{¶ 125}  *"Q.   —just a moment, let me finish the question.*

{¶ 126}  *"A.   Sure, I apologize.*

{¶ 127}  *"Q.   All of these other individuals including Patty Naumann you took those into account and then concluded you had no doubt?*

{¶ 128}  *"A.   That's right, when I took individuals into account I considered where they worked, whether they were in finishing, behind the wall, whether they were able to be exposed to the day-to-day activities of the interaction of Mr. Blatnik and Ms. Zacharias, whether they were in the headquarters building, the fact of the matter is that when I came on the scene in December of '97 I had every interest of getting to the bottom of this and looked at as much as I could to*

*determine what our liability to Ms. Zacharias was and weighed the credibility and the testimony of all the witnesses."* (Emphasis added.)

{¶ 129} At best, this evidence merely shows that appellants knew the evidence as to the truth of the allegations against Mr. Blatnik was not clear cut. This awareness by appellants that they would have to make a choice as to who to believe, however, is not fatal. This is because appellees had to demonstrate by clear and convincing evidence that the published statements were made with "a *high degree of awareness of its probable falsity.*" (Emphasis added.) *Varanese* at 80, 518 N.E.2d 1177. Doubts as to *possible* falsity are immaterial. Id. at 82, 518 N.E.2d 1177.

{¶ 130} Moreover, Avery Dennison's 1994 position statement to the OCRC is not the only evidence which had to be considered in proving actual malice because "actual malice is to be measured *as of the time of publication*[,]" which in this case occurred in 1998. (Emphasis added.) *Varanese* at 80, 518 N.E.2d 1177.

{¶ 131} In summation, there was absolutely no evidence of convincing clarity presented by appellees that demonstrated that, at the time the statements were made, appellants acted with any degree of malice, much less actual malice. As such, the trial court erred in denying appellants' motions for a directed verdict, judgment notwithstanding the verdict, and/or a new trial as to this point.

{¶ 132} As for appellees' prayer for punitive damages, they failed to present any evidence tending to show that appellants' conduct was motivated by hatred, ill will, revenge, or a conscious disregard for Mr. Blatnik's rights. To the contrary, despite their initial position, appellants ultimately conducted a thorough investigation. Scheibel was aware that he would have to make credibility assessments because of the conflicting stories as to whether Mr. Blatnik sexually harassed Zacharias. As illustrated through his testimony, Scheibel set out the basis on which he made those assessments. He, along with Szmagala, unequivocally stated that the purpose of making the statements was to ensure that the employees understood the company's sexual harassment policy and to show that such conduct would not be tolerated.

{¶ 133} What is most compelling is the fact that appellees failed to rebut this final assertion during trial. The record indicates that appellees presented no other evidence as to any malicious motive or contrary reason for appellants' conduct.

{¶ 134} Further, it is also clear that appellees' punitive damages and loss of consortium claims were derivative in nature. Because appellees did not have a primary claim for relief, appellees' derivative claims must also fail. See, e.g., *Bowen v. Kil–Kare, Inc.* (1992), 63 Ohio St.3d 84, 92–93, 585 N.E.2d 384.

{¶ 135}   Based on the foregoing reasons, I believe that the jury verdict should be reversed, and judgment should be entered in favor of appellants as to all issues.